[No. 24171. Department One. April 21, 1933.]

NANNETTE B. CHERRY, *Respondent,* v. GENERAL PETRO-
LEUM CORPORATION OF CALIFORNIA *et al.,*
*Appellants.*[1]

*Bogle, Bogle & Gates* and *Ray Dumett,* for appellant
General Petroleum Corporation of California.

*Henry T. Ivers,* for appellants Bailey *et al.*

*Poe, Falknor, Falknor & Emory* and *Chas. M. Fouts,*
for respondent.

BEALS, C. J.—For some years prior to the winter of
1931, plaintiff was operating a hotel in a three-story
brick veneer building fronting on Columbia street, in
the city of Seattle, and located on the easterly portion
of lots 1 and 4 of block 29 of what is generally known
as C. D. Boren's addition to the city of Seattle. Plain-
tiff owned the furniture in this hotel, which she had
been operating for many years.

[1]Reported in 21 P. (2d) 520.

Plaintiff in her amended complaint alleged that defendant General Petroleum Corporation of California owned a tract of land adjoining the hotel property, and that, during the month of February, 1931, the defendant named and the other defendants, its agents, removed from the property last referred to earth constituting the lateral support of the land upon which the hotel was located, causing the natural surface of the earth of the hotel property to give way and slide; that, by reason of the premises, the hotel building operated by plaintiff was rendered unsafe and persons occupying the same were placed in a position of peril; that, at this time, agents of defendants rushed into plaintiff's building and suddenly announced to plaintiff that the hotel was being undermined and was about to be destroyed, and that plaintiff should at once remove all persons and property from the southerly eighteen rooms thereof.

Plaintiff further alleged that she, being an experienced hotel manager fifty years of age, realizing the gravity of the situation and being at the time in good health, exerted herself to the utmost to comply with the notice given her by defendants, and that she was required to spend the remainder of the night in complying with the commands of defendants, protecting her guests and removing the furniture and effects from the eighteen rooms referred to; that, by reason of the great exertions to which she was driven by the situation created by defendants, and that, as a direct and proximate result thereof, plaintiff suffered a general nervous breakdown and her nervous system was permanently injured; for all of which plaintiff claimed damages in the sum of ten thousand dollars.

Plaintiff did not in her amended complaint allege any negligence on the part of defendants or any of them. She simply alleged that defendants had removed the

lateral support, causing the land upon which was located the hotel building to slide, thereby creating a dangerous situation, to meet which she went to the extraordinary exertions described in her complaint.

Defendants in their several answers denied that plaintiff had suffered any damage or that defendants were in any way responsible to her, the defendant owner pleading affirmatively that the subsidence of the soil on the property upon which the hotel was located was caused by the weight of the hotel building. Defendant contractors in their answer pleaded affirmatively that the work of excavation was done by them under contract with the owner, and that they were without fault in the premises. Plaintiff replied to the affirmative defenses with denials, and the action was tried to a jury, which returned a verdict in plaintiff's favor against all of defendants in the sum of two thousand dollars. From a judgment entered on this verdict, defendants appeal.

Appellants at all stages of the proceedings challenged the sufficiency of the complaint and plaintiff's evidence introduced thereunder. They assign error upon the overruling of their objection to the introduction of any evidence, upon the denial of their challenge to the sufficiency thereof, and upon the denial of their motions for a directed verdict and for judgment notwithstanding the verdict. They also contend that the trial court erred in entering judgment against them and in denying their motion for a new trial. Many other errors are assigned, but in view of our opinion upon the questions hereinabove suggested, the other errors need not be discussed.

Appellants argue that any damages suffered by respondent were not the proximate result of any act or omission on their part. From respondent's testimony, it appears that she was first advised of the slide by a

workman in the employ of the contractors not later than half past five o'clock on a February afternoon. She then herself, after a personal investigation, realized the gravity of the situation and understood that the rear portion of the hotel was in some danger of falling into the excavation. Between two and three hours after this, or at approximately eight o'clock in the evening, respondent, after some preliminary moving, undertook to remove the personal property and furniture from the rear tier of rooms of the hotel.

Respondent testified that, after she had been first warned of the danger and had examined the situation for herself, she entered the lobby of her hotel, where she found three or four men, including appellant contractors, who told her not to be excited or alarmed and that they would take care of the matter, although warning her that the situation was dangerous. At this time, respondent was naturally in a highly nervous state and was greatly exercised for the safety of her guests and her hotel. It clearly appears, however, from her testimony, that appellants told her that she need not be afraid, although she was advised to lose no time in having the rear eighteen rooms vacated.

Respondent had in her employ a man who acted as night clerk, and she testified that, on this evening, she employed another man, "to sit up on another floor in case that if anything might happen, to get our guests out."

Respondent testified that she worked until after twelve o'clock, and that she sat up the balance of the night. Respondent testified that she commenced the heavy work of moving furniture about eight o'clock in the evening. Prior to that time, she had, with some assistance, moved the baggage of one or two guests, but as to these, respondent testified that she had help, the night clerk having moved a trunk and other aid

having been extended to her. A mother and daughter who occupied one room changed their quarters, but did most of their own moving.

Respondent's testimony concerning the events of the afternoon and evening is very confused, but it is perfectly clear that she did not herself undertake any arduous labor until eight o'clock in the evening. She was undoubtedly rendered excited and nervous by the dangerous situation which developed from the slide, but she did not unduly physically exert herself until two hours or more after she had been fully advised as to the situation.

It does not appear that the hotel building itself suffered any actual damage, and respondent's delay in removing her furniture indicates that she did not anticipate any instant danger.

Respondent also testified that she had a transient guest in one of the rooms in the rear of the hotel, and that she did not deem it necessary to change his room, which he occupied during the night in question. Concerning this matter, respondent testified as follows:

"A. That is the southwest corner, 212. 214. Q. The southeast corner is 214? A. Yes, sir. Q. And there was a transient in there? A. Yes, sir. Q. Did you move him out? A. No. I knew that he was going to leave in a few days. Q. Did he sleep there that night? A. Yes, sir. That was one reason, too, why I sat up all night. Q. You could have moved him up forward, couldn't you? A. I could have moved him, yes, but I didn't want to disturb my guests any more than I could help, or frighten them any more than I could help. Q. Room 212, was there a transient there? A. Mr. Mortensen was in there. Q. And Room 311? A. I think his name was Hoover. He is not with me any more. Q. 315, do you remember who was in there? A. 315 was a young lady. Q. Do you remember her name? A. Kerr, I think. Q. Kerr? A. Yes, sir. Q. 316? A. Christensen. Q. 407? A. I don't remember that party. It was a man and his two sons, I think.

Q. 411? A. 411—I believe his name—Johnson is in there now. There was somebody before him. I would have to look that up. It has been about a year ago. Q. 410? A. I don't remember. Q. 408? A. I don't remember. Q. 215? A. 215 was McElroy. Q. McElroy? A. Yes, sir. Q. Now, were any of these people home at the time? A. Just the Christensens as I can remember. Q. And did you move 210 that night? A. No. Q. Did you move 215? A. He was there just for a short time, too. 215 did you say? Q. Yes. A. No. He kind of helped me look out. Q. Pardon? A. 215 kind of helped me watch. Q. 215, McElroy, helped you watch? A. Yes, sir. Q. 408, did you move that? A. No. · Q. 410? A. No. Q. 411? A. No. Q. 407? A. No. Q. Did you move 315? A. I did move them, but then not right away, either. Q. You didn't move them that night? A. No. Q. How long afterwards did you move them? A. Well, the next day I got busy and tried to take care of them all. Q. The next day? A. Yes, sir. Q. Now, 211, did you move them that night? A. No, I did not. Q. 214, you didn't move them, you said? A. No. Q. So that that night all that you moved were Mortensen and the Christensens? A. I think so, yes, as near as I can remember. I don't remember exactly.''

Here we have no such emergency as would bring this case within the rule of *Scott v. Shepherd,* 2 W. Bl. 892 (the squib case), in which the person originally placing in operation the dangerous agency was held liable to the ultimate sufferer upon the ground that the acts of the intermediate agents were involuntary and performed instantaneously under the stress of great and immediate peril, no opportunity having been afforded for the thoughtful exercise of their volition. While in the case at bar, it is easy to understand that respondent must have been greatly excited and worried over the imminent danger to her property, it is evident that the physical labor which she performed, and which she contends resulted in her nervous break-

down, was performed only after the expiration of a space of time ample to afford a reasonable opportunity to deliberate and determine upon the best policy to be followed.

Respondent does not contend that her acts were necessary to prevent danger to life or limb. She was simply endeavoring to place her property in a position of security. Disregarding the extremely unsatisfactory nature of respondent's testimony as to her physical efforts, and assuming that her exertions were too great for a woman of her age and strength, we are satisfied that, as matter of law, it must be held that respondent in what she did was exercising her own deliberate volition after the lapse of considerable time, that her acts were too remote from the acts of appellant, and that for injuries resulting therefrom, if any, appellants can not be held legally responsible.

In the case of *Ottevaere v. Spokane,* 89 Wash. 681, 155 Pac. 146, it appeared that the plaintiff, a patron of the city water system, attempting to cut off the water from her house, such action having been rendered necessary by a break in the meter, in exerting her full strength in an effort to close the valve, slipped and fell. From a judgment in favor of the city, the plaintiff appealed, and this court, in affirming the judgment, said:

"All of the cases agree that an injury which is the natural and probable consequence of an act of negligence is actionable, and that such an act is the proximate cause of the injury. It is equally well settled that an injury which could not have been foreseen nor reasonably anticipated as the probable result of an act of negligence is not actionable, and that such an act is either the remote cause, or no cause whatever, of the injury. The present case, we are clear, falls within the latter rule. The city could not reasonably anticipate that the breaking of the water meter, or the strain required to turn the stop valve, would cause the peculiar accident suffered by the appellant. It could an-

ticipate, of course, that an attempt would be made to shut off the water by turning the stop valve if the water meter broke and let the water escape in the basement. Indeed, that was one of the purposes for which the stop valve was installed. But it could not reasonably anticipate that a lift thereon would cause the person making the lift to fall on the floor. It is possible for such a thing to happen, but it is not the usual nor the natural result of such an act. On the contrary, it is the unusual and unnatural result of such an act, and these the city is not required to anticipate. To hold otherwise would make the city an insurer against all acts arising from a break in its water system caused by a defect therein. It would be liable whenever the negligence furnished a condition by which the injury was made possible, however remotely the condition and injury might be separated, if only the injury can be traced to the negligent act by a sequence of causes. But as was said by the supreme court of the United States in *Scheffer v. Railroad Co.,* 105 U. S. 249, holding a railroad company not liable for the death of a passenger who committed suicide while insane as the result of the injury while such a passenger:

" 'The argument is not sound which seeks to trace this immediate cause of the death through the previous stages of mental aberration, physical suffering, and eight months' disease and medical treatment to the original accident on the railroad. Such a course of possible or even logical argument would lead back to that "great first cause least understood," in which the train of all causation ends.' "

In the case of *Ewing v. Pittsburgh, C. C. & St. L. Ry. Co.,* 147 Pa. 40, 23 Atl. 340, 30 Am. St. 709, 14 L. R. A. 666, the supreme court of Pennsylvania held that the plaintiff was not entitled to recover because of injuries which she claimed to have suffered from fright occasioned by the throwing of some of the defendant's railroad cars upon her property. It was held that the plaintiff's injuries were not the proximate result of the

railroad accident, from which she suffered no physical damage.

A case more nearly in point is that of *Taylor v. Home Telephone Co.*, 163 Mich. 458, 128 N. W. 728, 31 L. R. A. (N. S.) 385, in which the supreme court of Michigan held that a telephone company was not liable for injuries suffered by the plaintiff in attempting to close a window through which water was streaming, the water having been released by the negligent act of the defendant. It was held that the plaintiff's act in attempting to close the window was voluntary, that she must have known that, in closing the window, she would get wet, and that, as matter of law, it should be held that, if this wetting resulted in illness, resulting damages were not the proximate result of the defendant's negligence.

In the case at bar, respondent must have known that fatigue would result from the arduous labor which she undertook to perform. That this fatigue resulted in injury to her nervous system rather than in direct physical injury, is an immaterial difference.

The opinion of the circuit court of appeals for the eighth circuit in the case of *Teis v. Smuggler Mining Co.*, 158 Fed. 260, is also in point upon this question.

Respondent, of course, suffered a severe mental shock because of the manifest danger to her property resulting from the land slip. She apparently, however, recognizes the rule of law to the effect that a mental shock resulting from mere negligence can not be made the basis of an action for damages unless there is some impact or direct physical invasion of the person or the injury results from some wilful or wanton act. *Ewing v. Pittsburgh, C. C. & St. L. Ry. Co., supra.* Respondent in the case at bar therefore attempts to trace her nervous condition to the physical exertion which she

was compelled, as she claims, to undergo by reason of the imminent danger to her property.

Her acts, however, were not sudden or spontaneous, nor were they occasioned by any such situation as would justify her in proceeding to extremities in an attempt to save her property. At least two hours elapsed before respondent commenced her labors. It appears from her own testimony that she had in her employ in the hotel two men, one of whom helped her move the property of one of her guests. She testified that she had some assistance in moving other articles. It is difficult to imagine why respondent should have felt that it was incumbent upon her to work until after midnight moving articles of furniture too heavy for her strength, when it is manifest that she could have easily procured assistance in this labor. If she chose to so exert herself, she can not hold appellants liable for resulting damage to her nervous system.

Respondent relies upon the case of *O'Meara v. Russell,* 90 Wash. 557, 156 Pac. 550, in which a recovery was allowed for damages resulting from fright occasioned by a blast which threw a stump a considerable distance and against the plaintiff's house. It was correctly held that pain and suffering resulting from fright constitute a proper element of damage, although no physical violence be done to the plaintiff's person, provided that "the injury is the proximate result of the negligent act, or is the natural and probable consequence thereof." The violent throwing of a stump against a house might well cause such a shock to the nervous system of a person standing near-by, and in apparent immediate danger of being struck, that serious damage might result, and the person who occasioned the injury should be held liable therefor. The plaintiff heard the blast and testified that she saw the stump coming in her direction. She thought it would

strike her, and while it did not do so, it struck the house a few feet above her head. This situation constituted an immediate physical invasion of the plaintiff's personal security, which she could not avoid, an entirely different situation from that here presented. In the case cited, the shock to the plaintiff's nerves was practically simultaneous with the blast, the actions of the plaintiff (over-exertion in leaving the place of danger) were spontaneous and not the result of deliberation or conscious volition, and were natural reactions to the situation.

In the case of *McClure v. Campbell,* 42 Wash. 252, 84 Pac. 825, this court held that, in an action for wrongful eviction, damages for mental suffering might be recovered, but the questions there determined were so different from those here presented that the case is not an authority.

Respondent also relies upon the case of *Netusil v. Novak,* 120 Neb. 751, 235 N. W. 335, and 122 Neb. 749, 241 N. W. 531, in which a recovery was allowed in favor of a woman frightened by a vicious dog that growled at her and evidenced an intent to attack her. The dog had previously bitten the plaintiff, who was afraid of the animal and who fainted immediately upon the dog manifesting an apparent intention to attack her a second time. In this case, also, the fright resulted at once upon the happening of the acts complained of, and amounted to an invasion of that personal security to the enjoyment of which everyone is entitled. The danger was apparent and real, the fright occurred immediately, and no opportunity for thought or deliberation was afforded. For these reasons, the case is not an authority on the questions here presented.

Unfortunate as is respondent's situation, and granting that she went through a very harrowing and nerve-racking experience, we must hold, as matter of law,

that appellants are not liable to her for any condition which may have resulted from her strenuous exertions in moving her furniture, two or three hours after she first became aware of the danger to her property. We find no testimony in the record which will support a judgment in respondent's favor based upon the injuries which she alleges she suffered.

The judgment appealed from is reversed, with instructions to dismiss the action.

MITCHELL, HOLCOMB, and MILLARD, JJ., concur.