[No. 35748.   Department Two.   September 27, 1962.]

DON D. MURPHY et al., Appellants, v. THE CITY OF TACOMA, Respondent.*

Burton W. Lyon, Jr., for appellants.

Marshall McCormick, Paul J. Nolan, and Quinby R. Bingham, for respondent.

*Reported in 374 P. (2d) 976.

DONWORTH, J.—This is an appeal from an order granting the city's motion for judgment n.o.v. and striking the jury's awards totalling $10,000 for mental anguish, suffering, discomfort, annoyance and inconvenience in three consolidated actions for damages to appellants' real property, alleged to have been caused by the acts of the city performed in connection with a public improvement described in this opinion.

This appeal is stated to be "a consolidated appeal on a short record." The appropriateness of this characterization may seem questionable in view of the fact that the record contains transcripts of 376 pages, a statement of facts exceeding 1,000 pages (with 78 exhibits referred to therein), and two briefs of approximately 100 pages each (containing 85 citations of prior decisions of this court exclusive of those from other jurisdictions).

In an endeavor to intelligibly set forth the rather involved factual pattern, we have inserted herein a map of the area involved which is based upon exhibit 35. Appellants are (or were at the time of the entry of the decree of appropriation in the condemnation proceeding hereinafter mentioned) the owners of four parcels of land in Pierce County located about three miles south of Eatonville. For convenience, they are numbered from 1 to 4, inclusive.

Parcel No. 1 consists of 53 acres of unimproved land (partially cleared) purchased in 1951, of which about nine acres were damaged by the public improvement made by the city later described herein.

Parcel No. 2 was purchased in 1948 and consists of over 500 acres, which is occupied by appellants as their home. It is improved by their residence and outbuildings. Between this property and the scene of the city's operations is a ten-acre tract belonging to the city of Eatonville.

Parcel No. 3 consists of 65 acres of unimproved and partially cleared land which was purchased in 1959 for $1,625 *after* appellants had filed a claim against the city for damages allegedly caused by the slide to other parcels. About four acres of this property was claimed to be damaged by the city's acts.

Parcel No. 4, consisting of 40 acres, was also purchased in 1959 *after* a claim and a suit based on damages to other property had been filed against the city. It lies between Parcel No. 2 and the slide area.

The three suits which were consolidated for trial arose as the result of a slide on a public road known as the Eaton-ville-Alder cut-off highway in Pierce County. In 1943, the city constructed a hydroelectric project on the Nisqually River, which flooded the existing road. The city conse-quently undertook to relocate the highway and to build a concrete overpass over certain railroad tracks (which were also relocated because of the flooding). To the north of this overpass, it was necessary to make a substantial fill to enable traffic to pass over this overpass.

The concrete overpass and the fill constituting the north approach thereto were constructed by the city under an agreement with Pierce County. The road was opened for public travel in 1944. Thereafter, the fill started to settle and the city, from time to time, placed many yards of ma-terial on the fill in an attempt to keep the surface of the road up to its original grade. During the next four years, the city placed an estimated 7,000 to 10,000 cubic yards of material in the fill. Between 1948 and the time of trial (April, 1960), 36,320 yards were added. This latter amount was more material than was originally put in the fill when it was first made.

The agreement between the city and Pierce County con-templated that the city would convey to the county the concrete viaduct and its approaches, but when the city, in 1952, tendered performance, the county commissioners de-clined to accept them for 20 reasons stated in their letter to the city.

The court entered a pretrial order limiting the issues, which is described in appellants' brief as follows:

"A pre-trial order was entered by the trial judge which provided that as part of the judgment in the damage actions by Murphys that the court might enter an order requiring the City to stabilize the road or relocate the same within 30 months after final judgment. The issue of nuisance or

negligence in the original construction of the overpass fill was eliminated but not as to nuisance which the plaintiffs Murphy alleged caused them to sustain personal and property damages. The issue of wilful damage to Murphys and their property was limited in time to the dates on which Murphys acquired title to their properties. Damages for constitutional taking was limited to a period of ten years and damages for constitutional damaging was limited to three years."

We do not deem it necessary to detail the conflicting theories of the parties as to what caused this continuing sliding of the fill nor the amount of the physical damages which appellants' various parcels sustained on account of such sliding.

In view of the only action of the trial court which is stated by appellants in their single assignment of error (quoted below) to be a ground for reversal, we will confine our discussion to the jury's answers to the special interrogatories, its verdicts, and the granting of the city's motion for judgment n.o.v. as to the awarding of the two items for mental anguish, suffering, annoyance, discomfort, and inconvenience.

Upon cross-examination, Don Murphy testified concerning his personal damages as follows:

"Q. Mr. Murphy, what effect, if any, did the continuation of this slide problem, in relation to your property and your projected development of it have on you personally during the period of time from the time it became a problem up to the present time? . . . A. Well, at that time why I had the intentions of putting in this housing development with Mr. Sutter and his associates and going ahead and making a resort out of the place with the residue of the money from the housing development, starting that phase of the thing, but the slide came and interrupted my plans, and in January of 1956 I had a meeting with Mr. Pflugmacher and Mr. Hanson of Tacoma City Light and Mr. Pflugmacher told me at that time that he was sure that he could get a settlement for me from the City and get the thing stopped, I thought.

"Well, this continued intermittently with promises that were never fulfilled and remedial work that was never done causing me a great deal of worry and mental suffering due

to the fact that I could not figure any way to go ahead with the project of putting the Flying 'M' Ranch into income-producing property, and I continued to talk to the City, finally calling in my attorney, Mr. Lyon, and then we continually kept after them and we were led to believe at various times that they were going to correct this situation and they were going to remunerate me for the damages done to me but it was something just like a bottomless pit, you could step in it and you'd never get up, there was nothing you could ever hang your hat on. There was no attempt at any point by the City to settle with me and to correct this nuisance and damage that was occurring and continuing to occur day by day. Not only were my plans upset but my normal operating capital was tied up in this project on which there was no return of money and it caused both me and my wife extreme financial difficulties and a lot of worry and suffering. . . . Q. Well, what I am trying to figure out is how you got the dollars and cents. You have indicated that you couldn't put it into operation, some of your promotions or developments. Well, did you sit down and say, 'I missed on one and that is $5,000', or what did you do, how did you get a figure of $47,500? A. Well, at the outset of the thing, Mr. Henriot, I had enough of my own money tied up in this venture, that's a fact that it was tied up and that I couldn't use it and that this was my operating capital that maybe I turned, normally I turned maybe every ninety days and it has been tied up there for five years and it causes me great mental anguish to have my money tied up here and see this ruination of the property continuing and nothing being done about it. I mean, if there had been something constructively done at any time during the last five years so I would have something to hang on to and say, 'Well, now, here, I can start figuring again', it would have stopped. Q. So you got mad and you figured because you got mad and you couldn't do your plan you would ask for $47,500, is that right? A. I resent that, Mr. Henriot. Q. Well, I am just asking. A. I did not get mad. I mean, I merely got perturbed. I cannot get mad and think, and at least I tried to be a thinker. I am getting too old to get mad anyway and the thing is as I previously stated, when I don't have my mind clear, that I am involved in this problem, my money is tied up, this thing is moving every day and I cannot proceed in an orderly fashion with the business at hand, why it does cause me mental anguish. Q. Did it cause any disturbance

at home, this mental anguish that you suffered? A. I would say it did, yes. Q. Well, then, in turn, did you worry about these disturbances at home? A. Not particularly. Q. Did this mental anguish you were suffering make your wife unhappy? A. It certainly did. Q. Did it make you unhappy to see her unhappy? A. That's right, it did. Q. It was all the fault of the City of Tacoma? A. Yes, it was. . . . Q. The idea that you might lose part of your property to the City of Tacoma to stabilize the road was part of this mental anguish, is that correct? A. Oh, I don't think that was the thing, Mr. Henriot. It wasn't the idea of stabilizing the road. I had offered them the right to come in there and stabilize the road if ditching would do it but it was the idea that, what Mr. Bannon said, he would just take enough of it down there to make a good boy out of me, he would take all of it if I didn't be good. . . . Q. Mr. Murphy, was this mental anguish, annoyance and inconvenience that you have referred to in your testimony related only to the proposition that the City was going to condemn your property or did it result from other aspects of the problem of the slide there on your property? A. It resulted from other aspects as well as condemnation. Q. Did this occupy much of your time or concern? A. In one way or another the last five years I have spent, I believe, a year on this situation here. I mean, there has been at least a full year of my time, or twenty percent of my time, has been spent on this particular issue. Q. In the last five years? A. In the past five years. Q. Could you form any estimate at all of how many times you have consulted with various persons about this problem the past five years? A. Many hundreds of times. Q. What about your examination of the property and the damage that was resulting from the continued movement of the property and the keeping of some kind of records of the progress of the damage to your property and so on in the past five years? Has that occupied much of your time or effort? A. Yes, it has occupied a lot of my time and effort because I have known from the very inception of this that unless I did have some kind of an accurate record that I would never be compensated. Q. Have your efforts to defend yourself against this sort of thing and to get some kind of decision made, some kind of solution obtained to the continuation of this problem involved additional expenditures over the amount of your original investment of some $15,000 in the improvement

of these two parcels of property? A. Yes, I feel that—well, I have spent thousands and thousands and thousands of dollars on the defense and getting the materials for the defense of this thing. As a matter of fact, it is a tremendous amount of money that I have spent on this. Q. Has the time that you have necessarily spent on the examination of the damages, the consultation with various people about what could be done and what had to be done to get this thing stopped and a solution found for it and the expense that has been incurred necessarily and unavoidably by you since this problem occurred contributed in any way to your annoyance or inconvenience or mental anguish? A. It certainly has because every time I would make a move why it seemed like I had to put out more money on the thing, and this thing has had the appearance of just pouring money down a bottomless pit, because I can never get a solution to it, I could never sit down and talk to anybody that would really say anything but, 'Here is your problem, get it evolved with the City and you might be able to work out something', but beyond that I haven't been able to do practically nothing with my overall plans up there with this problem of time. Normally I spend the weekends up there working on my place, but since this has been happening I have been having to spend the weekends on defense of this and keeping records and so on on this particular piece of property here."

Elizabeth L. Murphy testified as follows as to appellants' personal damages:

"Q. Now, what effect did this have farther down into the land itself, Mrs. Murphy? A. Well, the entire land slipped and big crevices. Q. Could you describe those, what they looked like, what they were like? A. When I went down the first time the grass, the dry grass was quite high and I often slipped clear up to my knees in clay and the soil, you never knew where you would find it. You would think when you would walk you were going to hit a dry spot and before you knew it you were way up. There were just big deep crevices on both sides and there may be a mound in the middle that you could walk on, but it was just full of crevices. . . . Q. Do you still find these crevices, can you still find these crevices there on the property? A. Oh, yes, it is like a river of mud now and clay. Q. What did this do to the development there? A. Well, it sort of ruined it. Q. Did it cut off roads? A. Yes. . . . Q. In

what way? A. Well, you can't—the slide itself pushed up big dips and it pushed away our preliminary roads we had in; it was just impassable to get in and the crevices, you couldn't get across them. Q. They were too soft to walk on? A. You were—you never knew when you were going to hit one or not. There might not be one there one day and the next time you go back there would be one. They were slipping, it was changing just all the time. Q. Mrs. Murphy, what did the situation, what effect did this situation have on either you or Mr. Murphy personally, if any? A. Well, we had plans for this development for some time since 1954 and ever since my husband and I were married we had talked about developing the ranch and having a development, and then more or less in the back of our minds, then we had something more concrete and, of course, when your plans are upset why it disturbs you greatly and we were greatly disturbed over it because we had done a great deal of work, preliminary work. Q. Did this disturbance to yourself or Mr. Murphy just occur once, at the time you became aware of some problem in the continuing of this project, or did it recur? A. It recurred and we were disturbed a great deal by it. Q. Has that continued up to the present time? A. Yes. Q. What about yourself, did it disturb you? A. Yes, it did, that our plans were just practically done away with and he was very upset and, of course, it affected our lives because I think the wife is more or less a listening post and when her husband is unhappy well then she notices it and he was very disturbed and unhappy and he mentioned it many, many times. In fact, it seemed like there for a period of time that was all he talked about. Q. Did he make efforts to work out some solution to this problem so that you could go ahead and continue with your development? A. Yes. Q. Did those plans ever result in anything, did you ever get a solution to this problem? A. No. Q. Why not? A. Well, we wrote letters to the City of Tacoma, I typed them myself, and we didn't get any satisfactory answers. In fact, we—I don't believe we got any answers. I can't recall getting any answer at all. Q. You never were able to reach any kind of an agreement with the City of Tacoma as to what could be done to stop the progress of this slide onto the property? A. No. Q. Did Mr. Murphy and yourself continue to make efforts to find some solution to that problem? A. Yes. Q. Did you personally ever form any estimate of the damage to the property resulting from the invasion of this property by the

slide material and the interruption of the development work that had occurred there? A. No. Q. You never put any value on that in damages? A. I didn't put any dollars and cents. I knew there was a great amount of damage done but I didn't feel that I could put any value on it. I didn't know how to estimate it. . . . Q. Has it been possible for you and Mr. Murphy to proceed with the development of this project since the occurrence of this slide, Mrs. Murphy? A. No. . . . Q. What was the origin of this name of 'Flying "M" Ranch', if you know? A. Well, previous to our marriage Don had dragged-strip more or less. He rented horses and we had a beautiful ranch and a view from up on the hill. We are right next to Pack Forest and it is beautiful, the surrounding countryside. You can see the mountains and it is very scenic and he kept horses. People like to go up and ride for the scenic view and they came and hunted and so forth, even did that after we were married; bridle trails. We did away more or less with the riding part, but he built his ponds and lakes and stocked them with fish because we always thought, 'Well, someday we would have a development.' We have always worked since our marriage towards that, with that in mind. Q. And did these people fish in the lakes from time to time? A. Oh, yes. We have trout planted in the lakes. Q. Did the people who came there appear to enjoy the scenic views of the property there? A. Oh, yes, very much, and they came back and when we built our recreation room onto our house we built it also in mind that some day—it is a huge room, fifty by twenty—that some day that that would also take part in our recreational facilities and our development. Q. It was planned as part of that? A. Yes. . . . Q. Is there a sign on the property designating it as the Flying 'M' Ranch? A. Yes, there is one up by the road. Q. How long has that sign been there, Mrs. Murphy? A. Since before our marriage and that has been before 1951. Q. Is the sign that is there now still that same original sign? A. Yes, it is. . . . Q. Mrs. Murphy, were you present at any time when a discussion occurred between Mr. Murphy and Mr. Frank Bannon and Mr. Pflugmacher and some other gentleman, I believe, by the name of Fred Hanson from the City of Tacoma? A. Yes. Q. Do you know about when it was that that occurred? A. It took place at our home at the Flying 'M' Ranch. Q. Do you know about when it was that that occurred? A. Well, I believe it was in '56 sometime. I couldn't give the exact date. Q. Was it after

you were aware of some slippage? A. Yes. Q. Onto your property? A. Yes. I think it was in the summer sometime but I am not absolutely sure. Q. Do you recall whether or not tempers seemed to get pretty hot on that occasion? A. Yes. Did you want me to— Q. (Interposing) Yes. A. I let them into the house. I believe I answered the door and they came in; there were three of them. I recognized Mr. Pflugmacher and was introduced to the other two, a Mr. Hanson and Mr. Bannon. Q. Bannon? A. And took them into the front room and Don came in and I was busy working around the kitchen and I could catch drifts of their voices and so forth, and I discovered that the argument was getting quite heated. The words, I believe it was Mr. Bannon, one of the gentlemen, said they would condemn the land and— Mr. Bingham: (Interposing) Objection, Your Honor. Let the record show that the City objects to this conversation as being immaterial and also for the reason that Mr. Bannon is now deceased and has been deceased for two or three years. Mr. Lyon: We went over that about six times. The Court: The record will show your objection. This was made in the presence of other parties, too. A. So I stepped into the doorway of the kitchen, the kitchen is right off the front room-living room, to listen, and Don said, 'Well, no one is going to condemn my land', and they were both very upset about it, and then Don said that he wouldn't let anybody on the property then, you know, to condemn his land, and that he would stuff him in the fireplace if he caused any trouble. . . . Q. Mrs. Murphy, in your Complaints in the two cases against the City of Tacoma you are alleging $47,500 mental anguish and I would ask you how much of that $47,500 mental anguish are you asking? A. I probably should be asking for all of it because I had to listen to my husband rave. Q. Does your husband rave quite a bit? A. No, but he gets quite heated over it when his plans are disrupted. Q. Your husband testified that he was a developer and promoter and has lots of projects. Does he get heated on projects when the plans— A. (Interposing) When plans don't go the way they should or are disrupted, why certainly, like anybody else. Q. So it wasn't unusual for him to become disturbed when a plan doesn't develop? A. Well, this has been over a much longer period of time. Q. But, he does get disturbed over other plans that are not fulfilled? A. Some, yes, to a slighter degree. . . ."

Fred Sutter testified to appellants' personal damages as follows:

"Q. Did you ever have occasion to observe whether or not Mr. Murphy sustained any kind of anguish or annoyance or inconvenience as a result of the interruption of the progress of this work that you and he had undertaken here? A. Yes, Sir. Q. Will you explain to the Jury what, if anything, you observed in that regard and when you observed it? A. Well, Mr. Murphy gets terribly upset. I mean, when he gets upset it is like an earthquake, he really gets upset, and then he eats stabilization pills and then an equinol pill to stabilize the pill and he really gets upset, and he was upset many times on this. Q. Did you see him when he was upset on this? A. Oh, yes, Sir. I saw him one time in particular when he had been working for some time on a deal to settle this affair with Mr. Pflugmacher and then it blew up and he was really upset. He had done a great deal of work. He had come down and asked about the cost on my dragline and so forth. He was working on them on a deal to amicably settle this and use part of his equipment which he had there, equipment of Murphy Logging Company, for fixing the roads. He had gone to great lengths to determine some of the costs and ways of doing it and the whole thing blew up. THE COURT: When was this in point of time? THE WITNESS: In point of time of this would be in the latter part of 1956. Q. Did you observe him on occasions thereafter? A. Yes, I saw him on several occasions. Q. Did your demands upon him cause him any inconvenience or annoyance or mental anguish, Mr. Sutter? A. It really did when I hired a lawyer and was going to sue him. I started in as a matter of fact to sue him. Of course, I told him several times ahead of time I was going to sue him if I didn't get paid pretty soon and he always said, 'Well, I have just about got this thing settled with the City', and on one other occasion he was in the process of trying to make a land trade and some timber was involved and he was quite certain that this was going to take care of things, but again it blew up. Q. How many times did these blow-ups occur on efforts of Mr. Murphy to reach some kind of a settlement or understanding with the City, to your knowledge? A. Oh, I would say when he was actually dealing or doing something with the City I would say I could recall a half a dozen of them. Of course, sometimes he was upset just over conversation. As a matter of fact, I saw him after the conversation he had with Mr.

Bannon and he was fit to be tied, that is about the only way I can put it."

The jury viewed the premises for an entire day and had ample opportunity to consider the damages to Murphys' property and their development plans by the city and the probability of personal damages resulting therefrom.

The trial of the three consolidated cases[1] before the court sitting with a jury consumed about six weeks' time. Much of the testimony presented by the parties was conflicting.

At the conclusion of the trial, the court submitted to the jury eight special interrogatories which were answered as follows:

"*Interrogatory No. 1:* What do you find from a preponderance of the evidence was the reasonable market value of any portion of plaintiffs' land described as Parcel No. 1 taken by the City of Tacoma prior to March 12, 1956? *Answer:* No value.

"*Interrogatory No. 2:* What do you find from a preponderance of the evidence was the damage, if any, to the plaintiffs said Parcel No. 1 occurring since March 12, 1956? *Answer:* $1,500.00.

"*Interrogatory No. 3:* What do you find from a preponderance of the evidence was the damage, if any, to the plaintiffs said Parcel No. 3 occurring since October 9, 1956? *Answer:* $1,250.00.

"*Interrogatory No. 4:* How many acres do you find to have been unconditionally appropriated and taken by the City of Tacoma in Parcel No. 1 prior to March 12, 1956? *Answer:* None.

"*Interrogatory No. 5:* How many acres do you find to have been damaged as distinguished from unconditionally

[1]*First action:* Instituted by appellants March 12, 1959, against the city for damages to Parcel No. 1. Their complaint was amended to ask for $35,000 damages to the land and $25,000 damages inflicted on them by reason of mental anguish caused by the land damage.

*Second action:* Instituted by appellants October 9, 1959, against the city for $16,400 damages to Parcel No. 3 and for $22,500 mental anguish caused by the land damage.

*Third action:* On May 7, 1959, the city commenced a condemnation proceeding to acquire 31 acres of land belonging to appellants to enable the city to construct ditches and stabilize the road by lowering the ground water level. The city's petition was later amended to reduce the area of the land condemned from 31 acres to 26.14 acres.

appropriated and taken by the City of Tacoma prior to March 12, 1956? *Answer:* 5 acres.

"*Interrogatory No. 6:* How many acres in Parcel No. 3 do you find to have been damaged by the City of Tacoma since October 9, 1956? *Answer:* 4 acres.

"*Interrogatory No. 7:* What would be the fair market value today of the 26.14 acres which the City of Tacoma seeks to condemn if in an undamaged state plus severance damages, if any, to the remaining property held by Don D. Murphy and Elizabeth L. Murphy? *Answer:* $20,000.00.

"*Interrogatory No. 8:* What do you find from a preponderance of the evidence was the damage, if any, to the plaintiffs' property described as Parcel No. 2, known as the homesite, occurring since March 12, 1956? *Answer:* None."

The jury's verdicts in the three cases were, in substance, as follows:

"In Cause No. 139074

| | |
|---|---:|
| For Murphys for taking and damaging of part of Parcel No. 1 | $1,500.00 |
| For Murphys for mental anguish, suffering, annoyance, discomfort and inconvenience from damaging Parcel No. 1 | $7,000.00 |

"In Cause No. 141356

| | |
|---|---:|
| For Murphys for taking and damaging part of Parcel No. 3 and continuing damages to Parcel No. 1 | $1,250.00 |
| For Murphys for mental anguish, suffering, annoyance, discomfort, and inconvenience from damaging Parcel No. 3 and continuing damages to Parcel No. 1 | $3,000.00 |

"In Cause No. 139663

| | |
|---|---:|
| For Murphys for fair market value today of 26.14 acres of land in present damaged condition for highest and best uses, together with damages, if any, to the remainder not taken | $17,250.00" |

The city moved for judgment notwithstanding the verdict against the two items of $7,000 and $3,000 which the jury awarded for mental anguish, suffering, annoyance, dis-

comfort, and inconvenience. In granting this motion, the trial court stated in its memorandum opinion:

"This action is the consolidation of two damage actions, Cause Nos. 139074 and 141356, wherein the plaintiff, Don D. Murphy, in each of the above two cases, sued the City of Tacoma for damages, and Cause No. 139663 is a condemnation action by said City of Tacoma, seeking to condemn the land, the subject matter of the said two damage actions. The consolidation was made by this Court,— (a) the same subject matter, and (b) the same parties, to save multiplicity of actions.

"The verdict in Cause No. 139074 allowed $7,000.00 'for Murphys for mental anguish, suffering, annoyance, discomfort, and inconvenience from damaging Parcel No. 1'. This part of this verdict is by this order set aside and judgment granted to the City of Tacoma N.O.V.

"In Cause No. 141356, the jury allowed $3,000.00 'for Murphys for mental anguish, suffering, annoyance, discomfort, and inconvenience from damaging Parcel 3 and continuing damages to Parcel No. 1'. This part of the verdict in this action is by this order set aside and judgment N.O.V. granted the City of Tacoma.

"This Court having read and studied the lengthy brief of Don D. Murphy and of the City of Tacoma concludes that there is no merit in law or in fact for the allowance by this Court of said judgments.

"This Court approves the balance of said jury's verdict in said actions."

The proceedings in the consolidated cases subsequent to the granting of this motion are described in appellants' brief as follows:

"Judgments were entered in accordance with the court's memorandum decision after additional argument. Appellants Murphy appealed from that portion of the judgments striking the jury's awards to Murphys for personal damages. Judgment was likewise entered in accordance with the jury's award in the condemnation motion [action]. The judgment awards for property damages in causes No. 139074 and No. 141356 and costs and for the taking of the 26.14 acres and costs have been fully paid and a decree of appropriation entered in the condemnation action. The appeals were consolidated by order of the court and stipulation of the parties. The Murphys have accepted the property damage awards and condemnation award and their costs

incurred. Murphys and the City of Tacoma have stipulated that such withdrawal of the judgment awards would waive all right to appeal or retry any issues of the cases except mental anguish, suffering, annoyance, discomfort and inconvenience or such limited issues as the Supreme Court may order. That is the only issue involved in this consolidated appeal on a short record."

Appellants' sole assignment of error is that:

"1. The court erred in granting the City's motion for judgments N.O.V. and striking the jury's awards of $10,-000.00 to appellants for mental anguish, suffering, discomfort, annoyance and inconvenience."

In support of this assignment, appellants contend that their mental anguish was caused by the following acts of the city:

1. Their property was subjected to increasing damage caused by the slide which continued over a long period of time, during which respondent not only did nothing to put a stop to it, but continued dumping material on the fill.

2. They were extremely upset by the prospect of having their land condemned.

3. Their plans for the development of their land as a guest ranch and for homesites were interfered with.

4. They received no, or at least evasive and unsatisfactory, answers to the queries which they sent to the city and during their interviews with various city officials.

Appellants have cited a multitude of cases, but none in which damages have been allowed for "mental anguish, suffering, annoyance, discomfort and inconvenience" under facts similar to the instant case.

Appellants, in their brief, state that:

"The rule of law regarding damages for mental suffering unaccompanied by physical violence resulting from a wilful act is stated by our court in *Gadbury v. Bleitz*, 133 Wash. 134 as follows:

" ' . . . damages are not recoverable for mental suffering unaccompanied by physical violence, occasioned by the negligence of another. That this is the rule in this State cannot be doubted. We have so held in *Corcoran v. Postal Telegraph Cable Co.*, 80 Wash. 570; *Kneass v. Cremation*

*Society of Washington,* 103 Wash. 521. However, we have adopted the rule that *if such suffering is the direct result of a wilful wrong as distinguished from one that is merely negligent, then there may be a recovery.* Citing *Wright v. Beardsley,* 46 Wash. 16.' (Emphasis supplied)

"See also to same effect, *United States v. Hambleton, et ux,* 185 Fed. 2d, 564; *Davis v. Tacoma R. & Power Co.,* 35 Wash. 203; *Wilson v. Northern Pac. R. Co.,* 5 Wash. 621; *Nordgren v. Lawrence,* 74 Wash. 305; *Browning v. Slenderella Systems,* 54 Wash. (2d) 440. See *Annotations Recovery of Exemplary or Punitive Damages from a Municipal Corporation,* 19 ALR, 2d, 903, particularly page 916.

"Appellants recognize that our court has not to this point allowed the recovery of punitive damages unless expressly authorized by a statute. In many of the earlier cases dealing with the question of recovery of punitive damages and cases dealing with the question of recovery of mental anguish resulting from wilful or malicious acts, the element of malice was regarded by the court as a necessary element to justify the allowance of such damages. More recently, however, the cases have recognized that malice may be implied by the law from certain acts which, although not motivated by actual malice, show a total disregard for the rights of others justifying a finding of implied malice. Appellants respectfully submit that the evidence of the City's continuance of the nuisance in the form of the unstable overpass fill which the City knew by its continued maintenance would continue to cause damage to the Murphys' property, created in 1943 and maintained continuously for a period of 17 years thereafter by the City, shows such a disregard for the property rights of appellants Murphy as to warrant the finding that the acts of the City were both wilful and malicious, as far as the appellants were affected by such acts. . . ."

■ There is no support in the record for any finding of malice, actual or implied. The activities of respondent are not attributable to any disregard of appellants' property rights, but rather to a recognition of its duty to maintain the highway in a safe condition. In so doing, it was bound to pay just compensation for private property taken or damaged.

" . . . Whatever its method, the city has taken respondent's property for a public use in virtue of its sover-

eignty, and subject only to the limitations to be found in the constitution. When taking private property for a public use, the state acts in its sovereign capacity. *Gasaway v. Seattle,* 52 Wash. 444, 100 Pac. 991, 21 L. R. A. (N. S.) 68; *Samish River Boom Co. v. Union Boom Co.,* 32 Wash. 586, 73 Pac. 670. It goes not as a trespasser, inspired by selfish or unlawful motive, but as one taking without malice or intent to do wrong and presumptively for the public good. . . . " *Kincaid v. Seattle,* 74 Wash. 617, 620, 134 Pac. 504; 135 Pac. 820 (1913).

It was respondent's duty to maintain the highway in a safe condition, and we cannot say that the duty was carried out in an arbitrary or unreasonable manner. Certainly, respondent's conduct was neither insulting, malicious, nor intended to give rise to emotional disturbance. Nor is there any evidence that the various delays encountered by appellants were intentional or anything other than normal.

Appellants next contend that:

"The State of Washington has for almost sixty years recognized the right of recovery for damages resulting from the maintenance of a nuisance which caused the complaining party to sustain personal damages for mental and physical suffering, discomfort, inconvenience and annoyance."

Although we do not think that the dumping of material on the highway right of way in a reasonable effort to maintain the highway in a safe condition resulted in anything more than a compensable taking in this case (*cf. Peterson v. King Cy.,* 45 Wn. (2d) 860, 278 P. (2d) 774 (1954) and authorities cited therein), it will be assumed, for the purpose of discussion, that the acts of respondent did result in a nuisance.

It should be borne in mind that the slide area was separated from appellants' home by a ten-acre tract of land belonging to the city of Eatonville. Furthermore, there was no evidence of personal discomfort resulting to appellants from the slide. There were no direct physical invasions of appellants' persons, nor any threat thereof.

A reading of the cases cited by both appellants and respondent indicates to us that, generally, in cases which do not involve malice or intent to do harm, there must be

either an immediate physical invasion of the plaintiff's person or security, or a direct possibility of such an invasion in order that recovery may be had for mental anguish or distress of mind. This holds true regardless of whether or not a nuisance is involved. See, *e.g.*, *Phillips v. Cordes Towing Ser.*, 50 Wn. (2d) 545, 313 P. (2d) 377 (1957); *Venske v. Johnson-Lieber Co.*, 47 Wn. (2d) 511, 288 P. (2d) 249 (1955); *Riblet v. Spokane-Portland Cement Co.*, 45 Wn. (2d) 346, 274 P. (2d) 574 (1954); *Frazee v. Western Dairy Products*, 182 Wash. 578, 47 P. (2d) 1037 (1935); *Cherry v. General Petroleum Corp.*, 172 Wash. 688, 21 P. (2d) 520 (1933); *O'Meara v. Russell*, 90 Wash. 557, 156 Pac. 550 (1916); *Corcoran v. Postal Telegraph-Cable Co.*, 80 Wash. 570, 142 Pac. 29 (1914); *Gates v. Bekins*, 44 Wash. 422, 87 Pac. 505 (1906).

This rule, of course, is simply a rule of thumb, *i.e.* a means of applying general tort principles to particular cases. At times, this court has deviated from the rule, either in its reasoning or on the facts (*i.e.* in allowing recovery for mental anguish and annoyance where no malice, physical invasion of the person, or reasonable fear of physical invasion was present).

In *Drake v. Smith*, 54 Wn. (2d) 57, 337 P. (2d) 1059 (1959), damages for "annoyance and inconvenience" were allowed to a plaintiff whose domestic water supply had been polluted. Arguably, the basis for the decision is that pollution of a household water supply may be regarded as a physical invasion of the occupant's person.

Another case which involved a kind of personal discomfort, and therefore arguably comes within the general rule as heretofore stated, is *Brillhardt v. Ben Tipp, Inc.*, 48 Wn. (2d) 722, 297 P. (2d) 232 (1956). In that case, defendant's sales slips inadvertently contained the telephone number of plaintiff, who was in the real-estate business. Plaintiff, for over two years, was harassed by countless telephone calls for defendant. During most of that period, defendant was aware of the results of the misprint on its sales slips. It could also, therefore, be argued that defendant was guilty

of implied malice in continuing to use its defective sales slips, knowing of the emotional stress and inconvenience which it was inflicting upon plaintiff. This court, while pointing out that there was a physical invasion of plaintiff's property, did not find either malice or a physical invasion of plaintiff's person. Nevertheless, a judgment in favor of plaintiff for "annoyance and inconvenience" was affirmed.

We regard these cases as exceptions, wherein the usual rule was not applied because recovery for personal inconvenience was warranted under more general principles of tort law. In these cases, the damages for personal annoyance and inconvenience were within the scope of the risk regarding which the defendants were negligent. In other words, the requirement of due care in those cases is imposed at least partially in order to avoid the annoyance, inconvenience, and emotional disturbance which are the natural, foreseeable, and probable consequences of a lack of due care in such situations.

In this case, there is no reason to deviate from the rule requiring either a showing of malice or some actual or threatened physical invasion of the person in order to warrant recovery of damages for "mental anguish, suffering, annoyance, discomfort and inconvenience."

The judgment of the trial court is affirmed.

FINLEY, C. J., OTT, HUNTER, and HAMILTON, JJ., concur.