[No. 5755–1–III. Division Three. May 30, 1985.]

GARY WILSON, ET AL, *Respondents,* v. KEY TRONIC
CORPORATION, ET AL, *Appellants.*

*Terence R. Whitten, Michael C. Ormsby, Eugene I. Annis, Gerald R. Neal,* and *Lukins & Annis,* for appellants.

*Hugh O. Evans, Constance D. Gould,* and *Evans, Craven & Lackie, P.S.,* for respondents.

THOMPSON, J.—Spokane County and Key Tronic Corporation appeal a judgment entered upon a jury verdict awarding five plaintiffs $308,950[1] damages, $73,805 attorney fees, and $2,022.99 costs based on an action arising from disposal of chemicals at the Spokane County landfill. We affirm.

From 1973 until 1976 Key Tronic Corporation, a manufacturer of computer keyboards, disposed of a cleaning byproduct containing 1–1–1 trichloroethane (1–1–1) at the Mica landfill in Spokane county. In 1975, at the request of the County, Key Tronic began disposing of the substance at the County landfill at Colbert and continued the practice until the fall of 1980. The Colbert site was operated by an independent contractor pursuant to a contract with the County.

In the fall of 1980, the State Department of Ecology (DOE) tested wells in the Colbert area and, after studying a federal Environmental Protection Agency (EPA) document referred to as the Suggested No Adverse Response Level document (SNARL), determined that 1–1–1 was present in higher than acceptable quantities.

The Wilsons, Kings, Rhodes and Brueggemans, who were property owners near the landfill, were notified by the DOE

---

[1] We note an unexplained difference of $250 between the jury verdict and the judgment.

in November of 1980 that they should not use their well water for drinking or cooking. In May of 1982, the Santoras drilled a replacement well on their property and were similarly advised by the DOE about a month later to discontinue drinking the water.

The five property owners commenced this action against Key Tronic and Spokane County based on claims of negligence, nuisance, and trespass, and against the County for inverse condemnation. Following a 3-week trial, the jury returned a verdict for the plaintiffs and judgment was entered March 11, 1983. The court awarded attorney fees and costs against the County, based on inverse condemnation. Key Tronic and the County appeal and the landowners cross-appeal the trial court's failure to give certain proposed instructions relevant to a claim under RCW 90.48, water pollution control.

First, the County and Key Tronic contend the court misinterpreted RCW 70.105.010(6) and WAC 173-302-100, and erroneously instructed the jury as a matter of law 1-1-1 was an "extremely hazardous waste" (EHW).[2]

RCW 70.105.010(5) and (6) provide:

> (5) "Dangerous wastes" means any discarded, useless, unwanted, or abandoned nonradioactive substances, including but not limited to certain pesticides, or any residues or containers of such substances which are disposed of in such quantity or concentration as to pose a substantial present or potential hazard to human health, wildlife, or the environment because such wastes or constituents or combinations of such wastes:
>
> (a) Have short-lived, toxic properties that may cause death, injury, or illness or have mutagenic, teratogenic, or

---

[2]The text of instruction 15 is as follows:

"A statute provides that: 'No person shall dispose of designated extremely hazardous wastes at any disposal site in the State of Washington.'

"Person is described as: 'Any person, firm, association, county, public or municipal or private corporation, agency or other entity whatsoever.'

"'Dispose' means the discarding or abandoning of extremely hazardous waste.

"You are further instructed that the chemical 1,1,1 Trichloroethane has been determined by the court to be an extremely hazardous waste.

"The statute became effective August 1, 1978."

carcinogenic properties; or

(b) Are corrosive, explosive, flammable, or may generate pressure through decomposition or other means.

(6) "Extremely hazardous waste" means any dangerous waste which

(a) will persist in a hazardous form for several years or more at a disposal site and which in its persistent form

(i) presents a significant environmental hazard and may be concentrated by living organisms through a food chain or may affect the genetic make–up of man or wildlife, and

(ii) is highly toxic to man or wildlife

(b) if disposed of at a disposal site in such quantities as would present an extreme hazard to man or the environment.

Former WAC 173–302–100[3] provided:

Criteria for extremely hazardous waste (EHW). In the Hazardous Waste Disposal Act of 1976, chapter 70.105 RCW, dangerous wastes are designated extremely hazardous because they:

(1) Are highly toxic to man and wildlife (WAC 173–302–110);

(2) Exist in such quantities as to present an extreme hazard to man or wildlife (WAC 173–302–120);

(3) Persist and affect genetic make–up or may be concentrated by living organisms (WAC 173–302–130).

The sections described here provide the methods of using known properties to designate EHW because of these three criteria.

The County and Key Tronic argue the statute requires a showing of three distinct criteria to establish an EHW— persistency, toxicity and quantity. They contend the WAC regulation improperly amends the statute by requiring a showing of only one of the three elements and that here, no proof was offered at trial as to the toxicity of 1–1–1.

■ We find the regulation, rather than modifying the statute, merely sets out independently the three measurable criteria determining whether a dangerous waste should

---

[3]Repealed February 10, 1982 and later promulgated as WAC 173–303–040(30) defining "extremely hazardous wastes" in language identical to that of RCW 70.105.010(6).

be considered an EHW. These criteria are contained in the statute: toxicity at RCW 70.105.010(6)(a)(ii); quantity at (6)(b); and persistency at (6)(a). The question is whether one or all of the standards must be met, given the absence of a conjunction between subsections (6)(a) and (b) of the statute. Assuming ambiguity exists, the court's primary objective in interpreting a statute is to ascertain and give effect to the intent of the Legislature as expressed in the act and the legislative purpose behind it. *Condit v. Lewis Refrigeration Co.*, 101 Wn.2d 106, 676 P.2d 466 (1984); *Nucleonics Alliance, Local 1–369 v. WPPSS*, 101 Wn.2d 24, 677 P.2d 108 (1984).

Legislative history may be considered in ascertaining intent, *Bellevue Fire Fighters Local 1604 v. Bellevue*, 100 Wn.2d 748, 675 P.2d 592 (1984), *cert. denied*, 105 S. Ct. 2017 (1985), and may be evidenced by statements from the bill's sponsor. *Marine Power & Equip. Co. v. Human Rights Comm'n Hearing Tribunal*, 39 Wn. App. 609, 619–20, 694 P.2d 697 (1985). In outlining the purpose behind Substitute Senate Bill 2038, which later became RCW 70.105, the bill's original sponsor, Senator Rasmussen, explained:

> [L]et me say the reason for the bill is at the present time nobody has any great knowledge of what type of hazardous wastes are going into the local disposal site and you well could be sitting on top of a bomb alongside of a city or alongside your pig farm and not know it, with the materials they are disposing. . . .
> . . . the purpose of the bill as it was originally introduced was so that there would be some control. There are companies now that pick up this hazardous waste from hospitals, from pesticide companies that want to dispose of it. They are in agreement that they are very hazardous and should be in the one location, not disposed of in the local dump.

Senate Journal, 44th Legislature (1976), at 318.

RCW 70.105A.010, enacted in 1983 to supplement and provide funds necessary for full implementation of hazardous waste regulation, provides in part:

(1) It is the policy of the state of Washington to protect the public health and welfare of all its citizens against the dangers arising from the generation, transport, treatment, storage, and disposal of hazardous wastes and from releases of hazardous substances. In order to reach that policy objective, it is not only necessary to provide state government with broad powers of regulation, control, and removal of these hazardous wastes and substances, including the power to fashion and effectuate remedial directives, but it is imperative that adequate funds are also provided to carry out these powers in a vigorous manner.

■■ The County and Key Tronic argue subsections (6)(a) and (b) should be read in the conjunctive, requiring a finding of persistency and toxicity, even where quantities of dangerous wastes as defined by RCW 70.105.010(5) are sufficient in themselves to present an extreme hazard. This we decline to do. The absence of a conjunctive "and" or disjunctive "or" connecting the two provisions is not cause to reach a strained result contrary to the broadly stated legislative purpose of protection from hazardous wastes.[4] Consequently, we find the statute satisfied upon a showing of either subsection (6)(a), persistency and toxicity, or (6)(b), quantity of dangerous wastes as defined in subsection (5). The testimony describing the dangerous qualities of 1–1–1 and the quantities in which it was dumped at Colbert was sufficient to support the trial court's conclusion based solely on RCW 70.105.010(6)(b) that 1–1–1 was an EHW. The instruction was proper.

■ Second, we are asked to decide whether it was error to allow an action against the County based on RCW

---

[4]*See State v. Keller,* 98 Wn.2d 725, 728–31, 657 P.2d 1384 (1983), where the court declined to require a finding of both statutory phrases connected by "and" and noted a great laxity and interchangeability of the use of the terms if consistent with legislative intent. *See also State v. Jones,* 32 Wn. App. 359, 647 P.2d 1039 (1982) (substituting "and" for "or" in interpreting RCW 10.77.110), *rev'd on other grounds,* 99 Wn.2d 735, 664 P.2d 1216 (1983). Where one conjunction has been treated as another, the absence of either, although not a recommended form of statutory drafting, should result in similar flexibility in order to reach clear legislative purposes.

70.105, hazardous waste disposal. Instruction 15 outlined the provisions of RCW 70.105.050 that prohibits a person, counties included, from disposing of EHW at any disposal site in the state (other than that established by chapter 70.105 at Hanford). The County argues it operated the landfill, but did not "dispose" of the EHW as contemplated by the statute. We are not persuaded. Testimony indicated that a former county employee and landfill supervisor, going beyond merely accepting the wastes, actually directed and developed the method for dumping the 1–1–1 at Colbert. This active participation will support the conclusion the County disposed of EHW in violation of the provisions of RCW 70.105.050.

Third, the County and Key Tronic contend since no proof of objective symptoms was offered at trial, the jury was improperly instructed on the issue of emotional distress. The court's instructions concerning damages for emotional distress were set out in instruction 21:

> In order to find damages for mental and emotional distress or anguish on behalf of any plaintiff against either defendant, you must find:
> (1) That the mental and emotional distress or anguish claimed by any plaintiff must be manifested by objective evidence.
> (2) That the plaintiff's reaction was that of a normally constituted person.

and a portion of instruction 23:

> If you find for one or more plaintiffs, . . . you may consider the following items . . .
>
> . . .
>
> (3) Mental anguish and emotional distress, both past and future, proximately caused by the actions of defendant . . .

In an action for nuisance, mental anguish resulting from that nuisance is compensable. *Miotke v. Spokane,* 101 Wn.2d 307, 332, 678 P.2d 803 (1984) (quoting *Riblet v. Spokane–Portland Cement Co.,* 45 Wn.2d 346, 353, 274 P.2d 574 (1954)). When the mental distress results from less than intentional or malicious conduct, under the

former "zone of danger" test, a showing of actual or possible direct physical invasion was generally necessary. *Murphy v. Tacoma,* 60 Wn.2d 603, 620–21, 374 P.2d 976 (1962). Under that test, pollution of a household water supply was regarded as a physical invasion of the occupant's person. *Murphy,* at 621, citing *Drake v. Smith,* 54 Wn.2d 57, 337 P.2d 1059 (1959). Applying that standard, the landowners here would recover.

The modern test set forth in *Hunsley v. Giard,* 87 Wn.2d 424, 553 P.2d 1096 (1976) provides a broader basis for recovery. Under the *Hunsley* test, where actual invasion of a plaintiff's person or security or a direct possibility thereof could not be made out, recovery was nevertheless warranted if the plaintiff's mental distress was the reaction of a reasonable person and manifested by objective symptoms.

*McRae v. Bolstad,* 32 Wn. App. 173, 178, 646 P.2d 771 (1982), *aff'd on other grounds,* 101 Wn.2d 161, 676 P.2d 496 (1984) found sewage and septic tank problems under the family home sufficient to support a finding of "mental distress", and quoted the trial court's observations regarding *objective symptoms:*

> This is a case in which the plaintiffs are entitled to recover for [mental suffering] because of the sewage involved, the septic tank problem in the house. That's a direct threat to the health of the family, and water under the house is enough to call mental distress, . . .

*McRae,* at 178–79.

The "direct threat" in *McRae* is similar to the one in this case; however, we decline to adopt the court's reasoning that the threat to the health of the family constituted "objective symptoms". Rather, we find such a threat of contact, or as in our case actual ingestion, satisfies the stricter invasion standard of *Murphy.* Fears of present and future health problems stemming from actual ingestion of the chemical by family members are not remote and fanciful, but rather are reasonable and therefore compensable.

The County and Key Tronic further contend jury instructions on damages were erroneous and resulted in

double recovery. They argue discomfort, annoyance, and mental anguish are indistinguishably caused by a single harm and should be consolidated as one remedy. We find, however, each distinct item of damage was supported by independent facts and uphold the award.

Instruction 23 states in pertinent part:

If you find for one or more plaintiffs, . . . you may consider the following items . . .

(1) Diminished value of the plaintiffs' properties;

(2) Damages for actual discomfort and annoyance up to the time of trial; and

(3) Mental anguish and emotional distress, both past and future, proximately caused by the actions of defendant Spokane County.

Case law in Washington delineates separate areas of recovery in damages to property and to the person. *Miotke,* at 332; *Barci v. Intalco Aluminum Corp.,* 11 Wn. App. 342, 353, 522 P.2d 1159 (1974). In an action for nuisance, injuries involving personal discomfort, annoyance, irritation and anguish, as well as property damage have been found compensable, *Miotke,* at 332; *Drake,* at 62; *Riblet,* at 353–54; *Freeman v. Intalco Aluminum Corp.,* 15 Wn. App. 677, 681–83, 552 P.2d 214 (1976).

Damages to property are characterized as diminished rental or use value where the injury to land is temporary, but where injury is permanent and irreparable, the damages are the difference in market value of the property before and after the creation of the nuisance. *Barci,* at 356. Here, diminished market value damages were appropriately awarded based on the permanent nature of the injury.

In addition, "annoyance and inconvenience" damages have been separately awarded in instances similar to that of *Riblet,* which involved the effects of cement dust on a home and swimming pool. Here, such factors as the inconvenience of months of hauling water and disruption of ordinary activities of family life form distinct and appropriate bases for recovery.

Finally, reasonable mental anguish caused by the threat

and actual ingestion of contaminated water is separately compensable, under the rationale of *Murphy* and *Drake.*

Fourth, it is claimed the court erred by omitting two elements from the nuisance instruction: (1) a requirement that plaintiffs be of ordinary sensibilities, and (2) a need to balance the respective rights of the parties.

■ Instruction 17 provided:

> Nuisance is any obstruction to the free use of property so as to essentially interfere with the comfortable enjoyment of life and property.
>
> One who creates and/or contributes to the creation of a nuisance is liable to any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance.

The instruction generally incorporates the provisions of RCW 7.48.010, which defines an actionable nuisance as:

> The obstruction of any highway or the closing of the channel of any stream used for boating or rafting logs, lumber or timber, or whatever is injurious to health or indecent or offensive to the senses, or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property, is a nuisance and the subject of an action for damages and other and further relief.

It is not error to instruct in the language of the controlling statute if the court's instructions taken as a whole properly inform the jury of the applicable law and allow each side to argue its theory. *Petersen v. State,* 100 Wn.2d 421, 432, 671 P.2d 230 (1983). Here, the general instruction was a correct statement of the law permitting adequate opportunity within its scope to argue the reasonableness of the landowners' use (ordinary sensibilities) and balancing of interests.

■ Fifth, Key Tronic and the County contend the admission of the SNARL document was erroneous because it was hearsay, prejudicial, and, if admitted to refresh recollection, should not have gone to the jury. The document was identified at trial by Claude Sappington, DOE eastern regional environmental quality supervisor, as a guideline

widely used by the EPA and DOE in the absence of a promulgated standard to determine drinking water safety. Government standards not having the force of law are admissible where relevant, trustworthy and necessary to prove the matter contained therein, *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 338, 582 P.2d 500 (1978). The court may properly refuse to admit "advisory recommendations", however, if the language used raises serious questions of trustworthiness and relevancy. *Haysom v. Coleman Lantern Co.*, 89 Wn.2d 474, 487, 573 P.2d 785, 93 A.L.R.3d 86 (1978). Here, the SNARL document, as an advisory recommendation, does not raise the "serious questions" of *Haysom* given the testimony of EPA and DOE officials' widespread and established reliance on it. Moreover, the objection goes to its weight, rather than admissibility. *Nordstrom v. White Metal Rolling & Stamping Corp.*, 75 Wn.2d 629, 635, 453 P.2d 619 (1969).

The following exchange occurred regarding the admissibility of the SNARL document:

MR. EVANS: Again, Your Honor, I would offer Plaintiffs' Exhibit No. 1. This happened over two years ago. Mr. Malm [a DOE official] has refreshed his recollection as to what he told Mrs. Wilson. To the best of his recollection he recalls telling her what the potential health effects were from the SNARL document. The potential health effects are contained in the SNARL document and I think that is the best evidence of what he probably told her.

THE COURT: On that basis the Court will admit Exhibit 1.

ER 803(a)(5) addresses recorded recollection as an exception to the hearsay rule:

(5) *Recorded Recollection.* A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be

read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

If SNARL was admitted as an ER 803(a)(5) exception, it should have been read into evidence in pertinent part rather than admitted in its entirety as an exhibit, unless offered by Key Tronic or the County. If evidence is *not offered to prove the truth of the matter asserted, it is not hearsay.* ER 801(c).[5] The SNARL document was admissible as evidence of that which was relied on by the officials and communicated to the landowners and was relevant to a determination of the reasonableness and extent of mental distress damages resulting from the warnings. The effect the warnings had on the landowners rather than the truth of the contents of the document was at issue. *See Moen v. Chestnut,* 9 Wn.2d 93, 108–09, 113 P.2d 1030 (1941). We will not disturb a trial court's ruling on the admissibility of evidence if it is sustainable on alternative grounds. *Thomas v. French,* 99 Wn.2d 95, 104, 659 P.2d 1097 (1983).

Sixth, we are asked to determine whether there was sufficient evidence to allow the jury to conclude the 1–1–1 came from the Colbert landfill and thus was the source and therefore the proximate cause of the landowners' damages. The defendants argue the verdict became speculative because the source and proximate cause were not established by expert testimony, *i.e.,* the sole expert, Dr. Maddox, an engineer and geologist hired by the County, could not give an expert opinion in this area. We disagree. The jury heard testimony that Key Tronic had been dumping 1–1–1 at Colbert from 1975 and that during the 9 months prior to cessation of the disposal in 1980, approximately 1,720 gallons of 1–1–1 and methylene chloride were dumped at that site. A county engineer testified that after a diligent search, the County found the Colbert landfill to be the sole

---

[5]ER 801(c):

"**Hearsay.** 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

source of 1–1–1 in the area.

The plaintiffs presented testimony from Dr. Maddox, who said the source of the contaminant was "either the existing Colbert landfill or a combination of the existing Colbert landfill and the Old Township Dump that is located immediately to the south across the road," but he could not tell as between the two "if it comes solely from one or from a combination of both". He further testified the old dump site had been closed in 1968, which was approximately 7 years prior to the initiation of dumping 1–1–1 in the area by Key Tronic.

When read in its entirety, Dr. Maddox' testimony established the landfill as the source of at least some, if not all of the 1–1–1 contamination and when taken in view of the other facts presented, the jury determination of proximate cause was within the evidence. The testimony of Dr. George Maddox was admissible to assist the trier of fact since the questions at issue involved matters not within the common knowledge of lay persons. *Tokarz v. Ford Motor Co.,* 8 Wn. App. 645, 653, 508 P.2d 1370 (1973). Once it is determined that the testimony is admissible, the thoroughness of the expert's examination is a matter of weight for the jury. *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 534, 452 P.2d 729 (1969); *Tokarz,* at 653; *Merriman v. Toothaker,* 9 Wn. App. 810, 815, 515 P.2d 509 (1973).

Seventh, the County contends there was insufficient evidence to support the jury finding of inverse condemnation.[6] The claim of inverse condemnation is founded on Const. art. 1, § 16 (amend. 9), which provides: "No private property shall be taken or damaged for public or private use without just compensation having been first made . . . ." and is an action brought against a governmental entity having the power of eminent domain to recover for property appropriation or damage. *Brazil v. Auburn,* 93 Wn.2d 484, 490, 610 P.2d 909 (1980). Const. art. 1, § 16 (amend. 9) was designed to compensate for damages result-

---

[6]The remaining issues are raised by the County alone.

ing from planned action rather than mere negligence, *Fralick v. Clark Cy.*, 22 Wn. App. 156, 162, 589 P.2d 273 (1978), and where nuisance and inverse condemnation claims are brought together, permanence of damage is required. *Miotke,* at 334. Recovery depends on a showing of "measurable or provable decline in market value . . ." *Highline Sch. Dist. 401 v. Port of Seattle,* 87 Wn.2d 6, 13, 548 P.2d 1085 (1976); *B & W Constr., Inc. v. Lacey,* 19 Wn. App. 220, 223, 577 P.2d 583 (1978).

It is conceded by the County that the Colbert landfill was operated by the County for public use and we find its operation analogous to the operation of a gravel pit determined to be a public use in *Boitano v. Snohomish Cy.,* 11 Wn.2d 664, 120 P.2d 490 (1941). The active supervision of the landfill and the acceptance of chemical wastes, knowing of its duty to avoid allowing disposal of extremely hazardous substances, amounts to planned action. The use was "planned" in that the County in 1975 asked Key Tronic to cease dumping its chemical wastes at Mica and move to Colbert. Moreover, the record discloses a county landfill supervisor actually authorized and developed the dumping method used at the site.

The damages were properly found to be permanent based on expert testimony that it would take a minimum of 25 years for the contamination to leach from the landfill and at least 100 years for it to disappear completely. We find sufficient evidence to support the jury's finding regarding inverse condemnation.

Eighth, we consider whether the trial court used an improper basis in awarding attorney fees under the eminent domain statute. At the time the award was made, RCW 8.25.070 provided in part:

(4) Reasonable attorney fees as authorized in this section shall not exceed the general trial rate, per day for actual trial time and the general hourly rate for preparation as provided in the minimum bar fee schedule of the county or judicial district in which the proceeding was instituted, or if no minimum bar fee schedule has been

adopted in the county, then the trial and hourly rates as provided in the minimum bar fee schedule customarily used in such county.

In 1975, the Supreme Court in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 44 L. Ed. 2d 572, 95 S. Ct. 2004 (1975) held minimum fee schedules published by a county bar association and enforced by the state bar violative of the Sherman Act, 15 U.S.C. § 1.

In 1984, 1 year after attorney fees were awarded in this case, subsection (4) of RCW 8.25.070 was amended to provide:

(4) Reasonable attorney fees as authorized in this section shall not exceed the general trial rate, per day customarily charged for general trial work by the condemnee's attorney for actual trial time and his or her hourly rate for preparation. Reasonable expert witness fees as authorized in this section shall not exceed the customary rates obtaining in the county by the hour for investigation and research and by the day or half day for trial attendance.

*See* Laws of 1984, ch. 129, § 1, p. 583.

 In making the award, the trial court noted the existing statute referred to "something that is no longer in existence", but acknowledged the intent of the Legislature was to disallow contingent fees in condemnation cases and concluded an award based on hourly rates was appropriate. After noting testimony which included figures ranging from $60 to over $200 per hour, the court assigned to the inverse condemnation claim 86 law clerk hours at $30 per hour, and 490 attorney office hours at $110 per hour. The court then increased that rate to $225 per hour for the 77 hours spent in trial on the issue of inverse condemnation. The awards were based on what the court deemed reasonable, but not necessarily customary.

Although the current statute does not allow the court to increase the award above customary charges for hours worked, and it is clear from reading each of the two statutes the Legislature intended to limit the amount of the award for attorney fees, we find the trial court lacked clear

guidance at the time of the 1983 award since portions of RCW 8.25.070, as previously noted herein, were invalid.

In the absence of statutory direction, the trial court has the discretionary power to award attorney fees in a reasonable amount and that discretion is abused only if no reasonable person would take the position adopted by the trial court. *Wilkinson v. Smith,* 31 Wn. App. 1, 14, 639 P.2d 768 (1982), After hearing testimony and considering the statute and prior condemnation awards, the court arrived at a determination of hourly rates which, under the facts of this case, was not an abuse of discretion.

Ninth, the County contends special verdict form questions 6 and 10 were impermissible comments on the evidence and amounted to a directed verdict on the RCW 70.105 issue.

The special verdict form included the following questions:

> Question No. 6: Did the actions of Spokane County in allowing the disposal of 1,1,1 Trichloroethane at the Colbert Landfill create a nuisance (as defined in Instruction No. 17)?
>
> . . .
>
> Question No. 10: Did the actions of Spokane County in allowing the dumping of 1,1,1 Trichloroethane at the Colbert Landfill create a trespass on the plaintiffs' properties as defined in Instruction No. 16?

The reference to the County "allowing" the dumping is challenged as an impermissible comment on the evidence given the County's position it had no actual knowledge of the identity of the chemical.

Const. art. 4, § 16 provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." An assumption of admitted facts is not a comment on the evidence, however. *State v. Browder,* 61 Wn.2d 300, 302, 378 P.2d 295, *cert. denied,* 375 U.S. 869, 11 L. Ed. 2d 96, 84 S. Ct. 93 (1963). The testimony of Key Tronic employee Robert Knack established that at least on one occasion he had specifically informed the landfill operator that the barrels contained 1–

1-1. The landfill operator, in turn, testified the original dumping was authorized by county employee Howard Hay, who also directed him to isolate the Key Tronic waste in a toxic waste pit away from the general public. Reviewing the record, no prejudice is evident in the content of the questions since the knowledge issue, if any, related not to knowledge of the presence of 1-1-1, but rather to knowledge that 1-1-1 had dangerous or extremely hazardous characteristics.

Finally, because we affirm the basis for the landowners' recovery on the theories examined herein, we need not reach the alleged additional violation of RCW 90.48, water pollution control, raised by the landowners on cross appeal.

The judgment of the trial court is affirmed and attorney fees and costs on appeal are granted.

GREEN, C.J., and McINTURFF, J., concur.