[No. 273-2.   Division Two.   January 18, 1972.]

WAYNE LAMPHIEAR et al., *Respondents*, v. SKAGIT CORPORA- TION, *Appellant.*

R. L. *Gemson* (of *Skeel, McKelvy, Henke, Evenson & Betts*), for appellant.

*Richard E. Goodwin* (of *Ingram, Zelasko & Goodwin*) and *Robert L. Charette* (of *Schumacher & Charette*), for respondents.

PETRIE, C.J.—Defendant, Skagit Corporation, brings this appeal from two jury verdicts entered against it. The appeal presents two main questions: (1) Was there sufficient evidence from which the jury could make a determination of defendant's liability; and (2) was there sufficient evidence to support an award for loss of profits?

The plaintiffs, Wayne Lamphiear, d/b/a Lamphiear Logging, and General Insurance Company of America, who carried Lamphiear's casualty insurance, instituted suit to recover damages incurred when a portable logging spar collapsed. Defendant had manufactured the spar and had sold it to Lamphiear for use in his logging operations. Plaintiffs relied on the theory of breach of warranty contending there was a manufacturing defect rendering the product unreasonably dangerous which defect was a proximate cause of their damages.

The jury was appropriately instructed:

4.

A manufacturer of a portable spar tree to be used as a yarding tower is liable in damages where it has been proved by a fair preponderance of the evidence that

    (1) A manufacturing defect existed;

    (2) The defect rendered the product unreasonably dangerous; and

    (3) Such defect was a proximate cause of plaintiffs' damages.

Where such a defect is proved, liability exists even though the manufacturer has exercised all possible care in the manufacture of the product.

*Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969).

A verdict of $20,800 was returned in favor of General Insurance on its subrogation claim for the payments it had made to indemnify Lamphiear for his property damage and Lamphiear was awarded $25,000 for loss of profits.

By its first two assignments of error defendant contends it was error to permit the issue of liability to go to the jury and the trial court erred in failing to direct a verdict in its favor. Defendant does not contend instruction No. 4 is an incorrect statement of the law, but assigns error to the instruction on the ground that there was insufficient evidence from which the jury could determine either that the spar contained a manufacturing defect, that the defect ren-

dered the product unreasonably dangerous, or that such defect was the proximate cause of the damages.

In deciding the first issue raised by defendant it is necessary to explain that the portable spar was basically a mobile steel tower composed of two steel tubes, one inside of the other, and mounted on a trailer. The tower reached a height of 120 feet when raised and the inner tube telescoped to its extended position. When raised to its proper height 10 feet of the inner tube remained within the outer tube. About 100 inches from the bottom of the inner tube was welded a reinforcing ring which also acted as a stopper to prevent the tube from being raised beyond that point. A locking ring was welded near the bottom of the inner tube. A set of six locking dogs mounted on the outer tower were designed to engage the locking ring and lock the tower in place. The dogs were spring loaded and when they passed over the locking ring they would snap into place with a resounding clang.

Prior to the collapse the spar had been raised three times. Initially it was raised under the supervision of two of defendant's employees. Thereafter Lamphiear's employees raised it without the assistance of defendant's personnel. After raising it for the third time and after having used it as last raised for about 3 weeks the inner tube gave way and slipped down violently. This caused the whole apparatus to upset causing considerable property damage.

Through the testimony of two expert witnesses plaintiffs advanced two theories to prove their allegations that a manufacturing defect rendered the spar unreasonably dangerous and was the proximate cause of the damage. Plaintiffs' first theory was advanced through the testimony of John N. Kniseley, a chemical engineer specializing in the field of industrial safety. Kniseley had inspected the spar after the collapse, both at the scene of the accident and later at one of Skagit's plants. He testified that the dogs had been cast and had not been machined to a sharp edge but, instead, had been left bullnosed or rounded and rough. He found the upper ring, the ring welded to the inner tube 100

inches above the lower end, had a rough lip left by the welding and he also found two spots on that lip where it appeared as if two of the dogs had caught and held quite severely. It was his opinion that, when the tower was raised on the final occasion before the collapse, the inner tube had not been raised far enough. Two of the dogs caught on the lip of the weld of the upper ring. The tower was thus temporarily locked in place and was able for awhile to withstand the pressures exerted upon it during operation. Kniseley also testified it would have been feasible to place flags on the dogs which would indicate to the operator on the ground by their angle whether or not each of the dogs had properly engaged. He further testified that a ring could have been painted on the inner tube to come into view when the dogs were capable of engaging, thereby eliminating any speculation as to whether or not the inner tube had been raised to its appropriate height.

Plaintiffs' second expert witness was Jack Tillman, a manufacturer of logging equipment including portable spars. Tillman had helped to right the collapsed spar and had done some damage repairs on it in his shop. While it was in his shop lying in a horizontal position he extended the spar and engaged the dogs. He put pressure on it and found only two of the dogs touched the locking ring at any one time, the others being up to more than one-quarter of an inch from the surface of the ring. Further, the ring surface was machined, but the dogs were cast and could not fit flush against the ring. He also found the surface of the locking ring upon which the dogs were designed to rest to be at a 90-degree angle to the tower. In his opinion the rocking motion of the tower while it was in operation caused the dogs to work loose from the ring one by one, causing the tower to collapse. He found scratches on the inner tube above the locking ring and believed they had been caused by the dogs rubbing against the tube as it fell downward. It was his further opinion that the two gouges found on the weld lip of the upper ring had been caused by the dogs striking the lip as the tube slipped past. Till-

man also testified it would have been feasible to put a device on the dogs to indicate to the operator whether or not they were engaged.

It is defendant's contention that plaintiffs' two theories were not founded on factual evidence. As such they were nothing more than conclusions drawn from mere inferences, and the jury was, therefore, indulging in mere speculation. Defendant concedes the collapse could have occurred in either of the two ways these experts suggested, but asserts it is just as likely it would have occurred as a result of the negligent erection of the tower by Lamphiear's personnel. In support of this contention defendant relies on the testimony of Roy Ritter, a Lamphiear employee who participated in raising the tower on the third occasion. Ritter testified that, at the time the tower was last raised, he did not think that it had been raised far enough based on his observation of the drum which contained the line used to hoist the tower. He thought the drum "hadn't got up to where it usually was when the thing locked." Further, he did not think it had properly locked because, when the dogs were to engage, he had not heard their usual loud bang. Upon informing the foreman of his opinion the foreman disagreed and concluded the tower would not stay up unless properly locked.

The burden is upon plaintiffs to show the proximate cause of the collapse was the result of a manufacturing defect rendering the spar unreasonably dangerous. They necessarily rest their case on expert opinion, but we cannot agree with defendant that the opinions expressed by plaintiffs' two experts were not founded upon facts in the case. Both Mr. Kniseley and Mr. Tillman testified they found the dogs were not machined but were bullnosed. Both found scratches on the inner tube and observed two gouges in the weld lip on the upper ring. With these facts Kniseley concluded the tower had not been fully extended, the dogs had engaged on a rough weld left on the upper ring and the tower was thus able to remain standing. In addition to those facts, Tillman noted that the locking ring surface was

machined and at a 90-degree angle to the tower and that only two of the bullnosed dogs when engaged touched on the locking surface. It was his conclusion the tower had properly locked but the dogs were able to work loose. Both experts testified to the feasibility of additional safety devices.

It is the rule that a verdict cannot be founded on mere theory, speculation or conjecture. *Sortland v. Sandwick,* 63 Wn.2d 207, 386 P.2d 130 (1963). Instead, the law requires verdicts rest upon evidence and, therefore, the opinions of expert witnesses, in order to reach the jury's consideration, must be founded upon facts of the case. *Prentice Packing & Storage Co. v. United Pac. Ins. Co.,* 5 Wn.2d 144, 106 P.2d 314 (1940). In the case at bar there was no direct proof of the cause of the collapse. It is defendant's contention that neither theory was more than an exercise in hindsight by piling one inference upon another to reach a conclusion on the ultimate fact. We cannot agree.

Proof of the fact to be established may be by direct or circumstantial evidence. *Arnold v. Sanstol,* 43 Wn.2d 94, 260 P.2d 327 (1953). There being no direct evidence, plaintiffs' proof was necessarily dependent on circumstantial facts. To reach the conclusion that a defect was the proximate cause of the accident it was necessary for the jury to infer the cause from the circumstantial facts. A verdict does not rest on speculation or conjecture when founded on reasonable inferences drawn from circumstantial facts. *Arnold v. Sanstol, supra.* As we stated in *Martin v. Insurance Co. of North America,* 1 Wn. App. 218, 221, 460 P.2d 682 (1969): "An inference is a logical conclusion or deduction from an established fact." We find sufficient facts from which the jury could reasonably and logically infer the collapse occurred either of two ways—the dogs initially did engage on the locking ring but worked loose, or the tower was raised only as high as the second ring and the dogs engaged temporarily on a weld lip on that ring. Either theory is plausible, either would place liability on defendant and the jury was entitled to believe either one. Both

are supported by sufficient circumstantial evidence from which reasonable minds could conclude there is a greater probability the collapse occurred through a defect for which defendant would be liable than there is that it occurred in a way for which defendant would not be liable. *Presnell v. Safeway Stores, Inc.,* 60 Wn.2d 671, 374 P.2d 939 (1962); *Home Ins. Co. v. Northern Pac. Ry.,* 18 Wn.2d 798, 140 P.2d 507, 147 A.L.R.2d 849 (1943).

Nor can we agree with what we believe to be an additional contention by defendant, that the jury was forced to speculate on the cause of the collapse because they were presented with three inconsistent and contradictory theories from which to choose. In addition to plaintiffs' two theories, defendant asserts the accident just as likely could have occurred through the negligent erection of the tower by Lamphiear's employees. As regards circumstantial evidence, it is the general rule:

> When the circumstances lend equal support to inconsistent conclusions or are equally consistent with contradictory hypotheses, the evidence will not be held sufficient to establish the asserted fact.

*Ruff v. Fruit Delivery Co.,* 22 Wn.2d 708, 720, 157 P.2d 730 (1945); *Helman v. Sacred Heart Hosp.,* 62 Wn.2d 136, 381 P.2d 605 (1963). While it is obvious plaintiffs' theories are inconsistent with each other to the extent that if one theory was correct the other could not be correct, they are not inconsistent with the main fact to be established. It is only necessary that the circumstances proved be consistent with each other and lead with reasonable certainty to the fact asserted. *Falconer v. Safeway Stores, Inc.,* 49 Wn.2d 478, 303 P.2d 294 (1956); *Ruff v. Fruit Delivery Co., supra.* For this reason defendant's evidence that Lamphiear's employees had improperly raised the tower cannot be said to be a circumstance lending equal support to inconsistent conclusions, nor can it be said to be equally consistent with contradictory hypotheses. Defendant attempted to show Lamphiear's employees had been negligent in failing to raise the tower high enough. Proof of such a fact under the

circumstances is not a contradictory or inconsistent hypothesis. On the contrary, it supports the inference that the tower had not been raised beyond the second ring and the dogs had engaged upon a weld lip. All three theories cannot be said to be contradictory when they could logically lead with reasonable certainty to the ultimate fact asserted.

Defendant's last two assignments of error deal with the sufficiency of plaintiff Lamphiear's proof of his loss of profits. Defendant assigns error to the admission of plaintiffs' exhibits 20 and 21 and to permitting the issue of Lamphiear's lost profits to go to the jury.

The collapse occurred on October 1, 1964. Lamphiear was and had been working under a contract to provide logs for the Weyerhaeuser Company at the rate of $22 per thousand board feet and $18 per cord for pulpwood. Evidence of his past production showed he had made a profit in 1960 and 1961, but showed he had operated at a loss for 1962 and 1963. From 1960 until the accident on October 1, 1964, Lamphiear had experienced a continued increase in production. His gross income had risen from $39,355 in 1960 to $208,597 in 1963. In 1964, notwithstanding the accident and certain difficulties he experienced in operating the newly purchased spar, his gross income was $249,796. Lamphiear testified his losses in 1962 and 1963 were due to another logging contract under which he had been making heavy capital expenditures on a road which had to be built before he could begin his logging operation. He was about to finish the road at the time the spar collapsed. As the result of the collapse, Lamphiear testified he was unable to complete his contract with Weyerhaeuser and it was canceled. Because his production had ceased he lost his credit, could not pay his creditors and eventually filed bankruptcy. There was further testimony, in addition to his past production and income, on his operating costs and other overhead expenses.

The trial judge admitted plaintiffs' exhibit 20, a list Lamphiear testified he had compiled of the board feet of lumber he had logged monthly from December, 1963 through September, 1964. Lamphiear testified he arrived at

the figures by totaling his scale slips for each month. Defendant's only objection was to the materiality of the exhibit. We find no error in admitting exhibit 20 since the production figures it illustrated have a direct bearing on the issue of profits.

It was Lamphiear's testimony that the purpose for buying the spar was to increase the volume of his production. Using the spar he estimated he would be able to produce one and one-quarter million board feet in each of at least 10 months of an average year. Plaintiffs' exhibit 21 was introduced as his planned production, gross income and expenses for an average year. It consisted of a single sheet of paper with Lamphiear's handwritten estimate of what his expected production would be in an average year using the spar. By multiplying this figure by the contract rate of $22 per thousand board feet which he was to receive under the Weyerhaeuser contract he arrived at his estimated gross income for an average year. Below these figures he separately summarized his average expenses. Lamphiear prepared the exhibit from his back files of previous years. He did not testify to each item of expense, one by one, but defendant's counsel, questioning on voir dire before the exhibit was admitted, was allowed ample opportunity to explore how it was compiled and how each figure was arrived at. Further, his basic business records were made available to defendant. Defendant objected to the admission of the exhibit on the ground it was incompetent to establish that Lamphiear lost profits as the result of the collapse. On appeal defendant contends exhibit 21 is no more than a self-serving declaration of Lamphiear's anticipated profits. Defendant argues that such a self-serving declaration is not admissible in evidence to prove the fact asserted. We cannot agree.

Defendant's objection that exhibit 21 is a self-serving declaration is more properly addressed to its character as hearsay evidence. The purpose of the hearsay rule is to exclude untrustworthy evidence which may be prejudicial to a litigant's cause or defense. The untrustwor-

thiness of such evidence exists in the inability to cross-examine the declarant. *Nordstrom v. White Metal Rolling & Stamping Corp.*, 75 Wn.2d 629, 453 P.2d 619 (1969). Under the circumstances the exhibit is not objectionable as hearsay. The declarant was present in court and was cross-examined. As an owner actively engaged in his business Lamphiear was qualified to give his opinion on prospective income and profits. *Reefer Queen Co. v. Marine Constr. & Design Co.*, 73 Wn.2d 774, 440 P.2d 448 (1968). Such testimony is necessarily self-serving, but that is a matter going to its weight rather than its admissibility.

■ Insofar as exhibit 21 pertained to his expenses we find the exhibit was properly admissible as a summary of Lamphiear's business records. While technically not the best evidence of the fact asserted, summaries of documentary evidence are admissible into evidence under an exception to the best evidence rule.

> Where a fact or facts can be ascertained only by the inspection of numerous books and records, which are themselves proper evidence, and the jury cannot satisfactorily nor conveniently examine the same in court, a qualified person, who has perused the entire mass, may state the result of his examination and use a summary of it to illustrate his conclusion.
>
> The rights of the opposing party are properly protected when the mass from which a summery is made is accessible to the opposing party, in order that he may inspect and test the correctness of the summary or use the material for cross-examination.

(Citations omitted.) *Keen v. O'Rourke*, 48 Wn.2d 1, 5, 290 P.2d 976 (1955). *See* 5 R. Meisenholder, Wash. Prac. § 98 (1965). We do not find exhibit 21 to be violative of the rule established in *Keen v. O'Rourke, supra*. It represents Lamphiear's summary of his past business records and files. The records themselves were not put into evidence but they were made available to defendant. Though defendant's cross-examination of Mr. Lamphiear attacked his competency to compile the exhibit, it is evident that the trial court found him qualified to testify regarding his business

records and that the weight to be given the exhibit was a question for the jury.

In holding the trial court did not err in admitting plaintiffs' exhibit 21 we do not intend to imply that we condone the use thereon of estimated future production expected from the new spar, which was included in a separate grouping of figures on the exhibit. These were figures to which Lamphiear had previously testified. While it may be permissible to use a summary of testimony under limited circumstances, that portion of the exhibit was merely a summarization of Lamphiear's oral testimony embodied in a written evidentiary exhibit and admitted for the jury's consideration. Its only effect was to overemphasize the particular testimony in the minds of the jury. *McCartney v. Old Line Life Ins. Co. of America,* 3 Wn. App. 92, 472 P.2d 581 (1970). Since the defendant did not specify the objectionable portion of the exhibit the court did not err in admitting that portion with the portion which was admissible. Where the evidence offered is admissible in part, objection must be made to the part which is inadmissible or the objection is of no avail. *Pacific Northwest Pipeline Corp. v. Myers,* 50 Wn.2d 288, 311 P.2d 655 (1957); *Keen v. O'Rourke, supra.*

Considering all the evidence presented on the issue of lost profits, we find it sufficient to justify the jury's award. Lost profits are recoverable as an element of damages to the extent the evidence permits their estimation with reasonable certainty and without resort to speculation or conjecture. *Box v. Crowther,* 3 Wn. App. 67, 473 P.2d 417 (1970). The difficulty in proving damages with exact certainty as in the instant case does not deny a litigant recovery where the fact of damages is firmly established. A wrongdoer will not be allowed to benefit from the difficulty of determining the dollar amount of a loss if the plaintiff has produced the best evidence available and if such evidence is sufficient to afford a reasonable basis for estimating his loss. *Reefer Queen Co. v. Marine Constr. & Design Co., supra.* Lamphiear experienced a loss during the 2 years

prior to 1964, the year of the loss, and presumably the year 1964 resulted in a loss for him. Nevertheless, the jury was presented with substantial evidence from which they could have concluded with reasonable certainty that Lamphiear suffered $25,000 in lost profits.

Since the spar was sold to Lamphiear for the purpose of increasing his production, and hopefully thereby his profit, we must concur with plaintiffs' argument that it is now inconsistent for defendant to argue that Lamphiear should not be allowed to demonstrate what profit he anticipated. Having established the fact that he was damaged, a plaintiff will not be denied recovery due to the uncertainty in his proof as to the amount of damages. In such a case a liberal rule is applied in determining the amount of an award. *Long v. T-H Trucking Co.*, 4 Wn. App. 922, 486 P.2d 300 (1971); *Box v. Crowther, supra.* The verdict of $25,000 is approximately 10 per cent of Lamphiear's actual gross income for 1964 up to the time of the collapse, and we think, well within the evidence.

We find no error. Both verdicts are affirmed.

PEARSON and ARMSTRONG, JJ., concur.