[No. 498-2.     Division Two.     April 25, 1972.]

GLEN E. RAYBELL, as *Administrator*, *Respondent*, v.
THE STATE OF WASHINGTON, *Appellant*.

*Slade Gorton, Attorney General,* and *W. George Bassett, Assistant,* for appellant.

*Owen P. Hughes* (of *Bonneville, Hughes & Viert*), for respondent.

PEARSON, J.—This is a wrongful death action brought by the personal representative of William A. Raybell, Sr., deceased, against the defendant, State of Washington. Raybell was killed on August 1, 1969, when the automobile he was driving left State Highway 165 and plunged to the bottom of the Carbon River Canyon in Pierce County. Plaintiff successfully contended to a jury that the state was negligent in maintaining an inherently dangerous highway with inadequate guardrails at the point where decedent's automobile left the road.

Defendant appeals the $80,000 judgment, contending the trial court erred in submitting the case to the jury in two main respects: (1) there was a failure of proof of primary negligence which proximately caused decedent's death; and (2) contributory negligence was established as a matter of law.

Since this was an unwitnessed accident, we must first determine whether the circumstantial evidence was sufficient to establish that decedent's death was proximately caused by the breach of a duty owed to him by the defendant, State of Washington. Then we must determine whether the evidence established decedent's contributory negligence as a matter of law.

In setting forth the operative facts, we are considering the evidence in a light favorable to the jury's determina-

tion and allowing plaintiff the benefit of all reasonable inferences from the relevant circumstances. *Papac v. Mayr Bros. Logging Co.*, 1 Wn. App. 33, 459 P.2d 57 (1969).

The precise reason why Raybell's vehicle left the highway was unknown. However, through photographic evidence, by the testimony of an accident reconstruction expert, and by the physical evidence presented, the following plausible explanation of how the accident occurred was presented to the jury by plaintiff's witnesses.

The scene of the accident was approximately 2,500 feet south of the Carbon River Bridge, some 4 miles south of Carbonado, on State Highway 165. This highway is a narrow, 2-lane asphalt road, with 9-foot driving lanes running generally north and south. At the accident location, the highway is bordered on the east by a sheer 400 to 450-foot drop into the Carbon River Canyon, and on the west by a rocky cliff that rises sharply from the westerly edge of the roadway. The road curves to the west around the cliff and then begins a slight turn back to the east at the accident site. The grade is slightly downhill for an automobile traveling northerly—the direction of Raybell's travel at the time of the accident. The posted speed limit is 35 miles per hour.

Decedent's vehicle left the roadway at a point where the roadway perceptibly narrows and at a point where frequent rock slides tumble off the cliff and across the highway.

Prior to February 1, 1967, the state had protected the easterly edge of the roadway with several hundred feet of guardrailing, consisting of concrete posts imbedded in the shoulder at 12-foot intervals, connected by two strands of steel cable. On February 1, 1967, a slide took out the major part of the easterly shoulder of the highway and with it about 180 feet of the guardrail. Instead of attempting to repair the shoulder and install a more permanent protective railing, the state erected a temporary guardrail, commencing some 6 feet north of the last post of the permanent guardrail. This temporary guardrail consisted of a single

12-inch steel band attached to wooden posts which were not imbedded in the ground, were not attached to the end of the permanent railing, and were originally supported by rocks and sandbags.

Of necessity, because of the loss of road shoulder, the temporary barricade was appreciably closer to the traveled portion of the highway than the remaining portion of the permanent guardrail to the south. From the photographs, it appears that the south end of the temporary barricade somewhat obstructs and narrows the width of the roadway. Originally, the temporary guardrail was equipped with three flashing lights and delineators to warn motorists of the danger. However, either because of vandalism or ordinary deterioration from frequent rock slides, the warning lights were not present at the time of this accident, nor were there any sandbags supporting the guardrail. It is reasonable to infer that at the time of the accident the railing itself would not have deflected even a slow-moving vehicle. Since there was a gap of some 6 feet between the temporary and the permanent railing, there was no protection at all at the precise point where the danger was the greatest, because of the narrowed roadway. It was at this point decedent's car left the roadway.

In 1969 decedent was 57 years old, married, with three minor children still living at home. The evidence demonstrated that on the day of the accident he had planned to drive south of Wilkeson on State Highway 165 in his 1961 Mercury Comet station wagon, to seek employment with a logging company. He was in good health and his vehicle was in good condition, with no known defects. He was generally unfamiliar with the highway in that area. It is reasonable to infer that he had passed the scene of the accident some time during the morning of August 1st, proceeding on that occasion in the southbound driving lane, near the rocky cliff abutting the westerly edge of the roadway.

The accident was not discovered until late in the afternoon, when an employee of the state noticed the temporary

guardrail tipped onto its face on the east edge of the driving surface. Other physical evidence was presented, by which the jury could reasonably infer that as decedent proceeded northerly the left front fender of his car came into contact with the southerly edge of the temporary guardrail and left the roadway at an angle estimated at 20 degrees to 25 degrees, proceeding through the unguarded area between the temporary and permanent guardrail and into the canyon.

To show the lack of effective warning of the deceptive roadway conditions, plaintiff offered evidence that view of the accident area was obscured because of the curve in the roadway a short distance to the south. The only warnings to northbound vehicles were situated some 1,500 feet to the south. One sign said, "Slide area 2 miles" and another said, "Rocks." There was no warning of the narrowing of the roadway or of the absence of shoulder or permanent guardrail.

To demonstrate that the absence of a properly installed and maintained guardrail was the cause of decedent's death, plaintiff introduced evidence through a qualified highway engineer that had a properly designed and installed guardrail been in place, a vehicle leaving the traveled portion of the roadway at the angle of travel of decedent's vehicle would have been deflected back on the highway at speeds as high as 48 miles per hour. The feasibility of such a guardrail was shown by the fact that the state later installed one in this location and had, prior to the accident, placed such railings in other similarly precipitous places.

This expert also testified that the condition and position of the temporary guardrail constituted an extremely hazardous condition for travelers on the highway. This testimony was buttressed by certain exhibits concerning highway design which were admitted over defendant's objection.[1] One of these exhibits was entitled "Highway

---

[1] The admissibility of the exhibits is discussed later in the opinion.

Design and Operational Practices Related to Highway Safety," dated February, 1967. This exhibit was approved by the Executive Committee of the American Association of State Highway Officials, one of whom was C. G. Prahl, former Washington State Highway Director. The portion pertaining to guardrails provided:

The objective in placing guardrail is to lessen the hazard to traffic and not to protect any part of the roadway structure. Guardrail should only be used where the result of striking the object or leaving the roadway would be more severe than the consequences of striking the rail. . . . To afford maximum protection and to develop the full strength of the rail in tension all guardrails on the approaches to structures must be attached securely to the structure and provide a relatively smooth configuration on the traffic side. . . .

The approach ends of guardrail are one of the more formidable roadside obstacles with which traffic must contend. The many spectacular accidents involving collisions with the guardrail ends document this serious hazard . . . It is strongly recommended that all guardrail approach ends be flared away from the roadway and anchored to the ground, or otherwise blended into the approach environment.

Also admitted over defendant's objection were four editions of a publication entitled, "A Policy on Geometric Design of Rural Highways,"—also published by the American Association of State Highway Officials—which, like the quoted exhibit, concerned the proper design, placement and purpose of guardrails. These exhibits demonstrated that the above-quoted policies had been well recognized by highway experts for many years.

The testimony established that the criteria set forth in these various publications pertaining to guardrails were known by and accepted by this state as reasonable highway safety standards.

The thrust of the defendant's case sought to establish that decedent's death was caused by his own negligence. To support this theory, certain of the state's witnesses testified that there were fresh marks on the rocky cliff and tire

marks below the marks on the narrow shoulder on the west side of the highway. These markings were some 40 feet south of the point where other tire markings showed decedent's vehicle had gone over the cliff. The hypothesis was that decedent had lost control of his vehicle, crossed the center line, colliding with the rock cliff, and then crossing both lanes of the highway again before plunging into the canyon. This theory was somewhat weakened by the fact that despite having a photographer present on the date of the accident, no reasonably clear photographs were presented depicting the alleged markings. Also, the absence of any tire markings on the paved portion of the highway caused the investigating state trooper to concede that this hypothesis was speculative.

Defendant also sought to establish that decedent was driving at an excessive rate of speed. The state's expert testified that the physical evidence of how long the car was airborne showed the speed to be either 41 or 48 miles per hour, depending on where the vehicle struck the edge of the canyon on the way to the bottom. This testimony was likewise weakened, however, by the difficulty encountered in precisely determining the distance the vehicle traveled outward before beginning its vertical descent.

Defendant also contended that the fact decedent's vehicle left the driving portion of the highway established decedent's negligence as a matter of law. This claim is premised upon RCW 46.61.670, which makes it unlawful to drive off the roadway except for the purpose of stopping or, having stopped, for the purpose of returning to the highway.

With these claims and operative facts in mind, we turn first to the state duty, having in mind that all elements of a negligence action including proximate cause may be established by inferences based upon circumstantial evidence. *Papac v. Mayr Bros. Logging Co.,* 1 Wn. App. 33, 459 P.2d 57 (1969); *DeYoung v. Campbell,* 51 Wn.2d 11, 315 P.2d 629 (1957).

The duty of a municipality owed to users of the highway has most recently been considered by the Su-

preme Court in *Bartlett v. Northern Pac. Ry.*, 74 Wn.2d 881, 882, 447 P.2d 735 (1968). Quoting from *Barton v. King County*, 18 Wn.2d 573, 576, 139 P.2d 1019 (1943), the Supreme Court reaffirmed the principle:

> The gist of the decisions in these cases, . . . . is that the municipality *may* be chargeable with negligence for failure to maintain warning signs or barriers *if the situation along the highway is inherently dangerous or of such character as to mislead a traveler exercising reasonable care.*

This rule does nothing more nor less than impose upon a municipality the duty of maintaining its streets or highways in a reasonably safe condition for the users, and where the condition in or along the highway is inherently dangerous *or* deceptive to the reasonably prudent traveler, the rule requires the municipality to reasonably and adequately warn of the hazard and maintain adequate protective barriers where such barriers are shown to be practical and feasible. *Bartlett v. Northern Pac. Ry., supra; Provins v. Bevis,* 70 Wn.2d 131, 422 P.2d 505 (1967).

We do not agree with the state's contention that the duty of a municipality to erect protective barriers or post warning signs along the roadway is confined to situations where there is an obstruction or defect in the driving surface of the road. *See Tyler v. Pierce County,* 188 Wash. 229, 62 P.2d 32 (1936); *Overton v. Wenatchee Beebe Orchard Co.,* 28 Wn.2d 377, 183 P.2d 473, 173 A.L.R. 616 (1947).

Insofar as those and other earlier cases are subject to such an interpretation, we think they are inconsistent with the principle announced in *Bartlett v. Northern Pac. Ry., supra,* and are also inconsistent with the statement of the rule itself. A roadway may be just as hazardous and deceptive by its design as it is by its surface. A roadway may be rendered as hazardous and deceptive by the placement of its signs or the improper placements of its protective railings as it is by an obstruction in its traveled portion. *Provins v. Bevis, supra.*

In mountain areas where roadways are narrow,

winding, and carved from the sides of steep cliffs—as is the case here—there is a compelling necessity for highway authorities to utilize modern design techniques which are financially practical and feasible, so as to furnish reasonable protection to the traveler. There is a growing awareness that highway design and the manner in which drivers are informed of the design plays more than an incidental part in highway accidents.

In the case at bar, the evidence was sufficient, in our judgment, to establish a fact question for the jury that the locus in quo was inherently dangerous *and* of such character as to mislead a traveler exercising reasonable care. The type of harm which occurred was reasonably foreseeable. *See Rikstad v. Holmberg,* 76 Wn.2d 265, 456 P.2d 355 (1969). There was, likewise, ample testimony that the state breached its duty, both in failing to adequately warn of the hazard and in failing to install a feasible barrier system along the roadway to protect those who reasonably became confused by the design of the highway.

The placement of the guardrail end in the manner depicted by the evidence, in violation of the safety criteria discussed above, and the evidence showing that decedent's vehicle came into contact with it, was, in our view, sufficient circumstantial evidence of proximate causation to warrant submission of that issue to the jury. Factual causation was also circumstantially established by testimony that a properly designed and installed guardrail would have deflected an automobile traveling at speeds substantially over the posted speed limit on the angle at which decedent's vehicle departed the roadway. *See Leach v. Weiss,* 2 Wn. App. 437, 467 P.2d 894 (1970).

■ Defendant urges, however, that where causation is based upon circumstantial evidence, the factual determination may not rest upon speculation and conjecture; and if there is nothing more substantial to proceed upon than two or more conjectural theories, under one or more of which a defendant would be liable, and under one or more of which there would be no liability, a jury is not permitted to

speculate on how the accident occurred. *Schneider v. Rowell's, Inc.,* 5 Wn. App. 165, 487 P.2d 253 (1971); *Gardner v. Seymour,* 27 Wn.2d 802, 180 P.2d 564 (1947).

That rule is applicable only where the jury must speculate on how the accident occurred. While we cannot know with certainty why decedent's vehicle left the road, there is neither a presumption that he did so negligently nor that he committed suicide. *Johnson v. Associated Sand & Gravel Co.,* 71 Wn.2d 738, 430 P.2d 944 (1967). On the other hand, there were substantial and not conjectural theories as to why his vehicle left the roadway and the outcome depended upon which circumstantial evidence the jury chose to believe. In our view, the rule contended for is not applicable here. *See Schneider v. Rowell's, Inc., supra.*

Defendant next contends that the court erroneously defined the duty of the state in its instructions. Instruction 5, which is set forth verbatim in the margin,[2] is a correct statement of the law and fully consonant with the principles we have enunciated pertaining to the duty of the state.

---

[2]Instruction 5 provides: "The State of Washington is required by law to exercise ordinary care in the repair and maintenance of its public highways keeping them in such condition that they are reasonably safe for ordinary travel by persons using them in a proper manner and using ordinary care for their own safety.

"Inherent in this duty to exercise ordinary care is the duty to eliminate a hazardous condition, if one exists, and its existence is known, or should have been known to the State in the exercise of reasonable care.

"These foregoing duties include the duty to maintain reasonable warning signs, barriers or reasonable guardrails if the situation alongside the highway, even though outside of the traveled portion of the highway, is inherently dangerous, or is of such a character as to mislead a person using said highway exercising reasonable care.

"Inherently dangerous, as used herein, means a danger existing at all times so as to require special precautions to prevent injury.

"Whether or not the warning signs, barriers or guardrails are reasonable depends upon the conditions that exist at the particular area involved, and whether or not reasonable protection is afforded those using the highway, and whether or not such devices do reasonably accomplish the purpose for which they were designed under conditions that could reasonably be anticipated by the State of Washington Highway Department at the particular point involved."

Defendant contends that the exhibits pertaining to guardrail safety policies should not have been admitted in evidence, asserting that they had no legal efficacy or sanction and contained inadmissible hearsay opinion evidence. Such a contention may have had merit prior to *Nordstrom v. White Metal Rolling & Stamping Corp.*, 75 Wn.2d 629, 453 P.2d 619 (1969). In our view, that case disposes of this contention. The challenged exhibits here fully meet the tests for admissibility of "safety code" as proscribed in *Nordstrom*. Likewise, as was true in that case, the state here produced no evidence that the challenged exhibits did not represent proper expert opinion on the subject matter of guardrails, nor did it furnish any testimony that the safety criteria set forth in the publications were not feasible, either financially or practically, under the circumstances of the case. The trial court properly instructed the jury that the provisions of the publications did not have the force of law; that evidence of noncompliance did not establish negligence as a matter of law; and that the jury could consider the publications only in connection with all other evidence bearing upon the question of negligence. It was not an abuse of discretion to allow the exhibits in evidence with the cautionary instruction.

█ Now, turning to the issue of contributory negligence, we start with the well-established principle that only in rare cases where reasonable minds cannot differ is the trial court warranted in deciding the issue as a matter of law. *Stevens v. State*, 4 Wn. App. 814, 484 P.2d 467 (1971).

The thrust of defendant's argument comes from RCW 46.61.670, which makes it unlawful to drive with the wheels off the traveled portion of the highway. It is contended that the undisputed evidence established decedent's violation of the statute and that he was, therefore, negligent per se, absent the showing of an excuse for the violation. *Bergstrom v. Ove*, 39 Wn.2d 78, 234 P.2d 548 (1951).

█ Assuming, arguendo, that this statute is applicable to the instant case, in our view it would have been error for

the trial court to determine as a matter of law that decedent's violation of the statute was a proximate cause of his death. *Leach v. Weiss,* 2 Wn. App. 437, 467 P.2d 894 (1970). It was, in our view, for the jury to determine whether or not the state's negligence, if any, in not furnishing proper and adequate railing, intervened and became the sole proximate cause of decedent's death. It was likewise for the jury to determine if the deceased was excused from violating the statute because of inadequate warning of the hazard and improper placement of the barricades.

■ In any event, it is doubtful if the roadway, because of its lack of a shoulder at the locus of the accident, was the type of roadway to which the statute would apply. According to one witness, the oilmat extended to within a few inches of the temporary barricade. In *Petersavage v. Bock,* 72 Wn.2d 1, 431 P.2d 603 (1967), it was pointed out that statutes concerning rules of the road and affecting highway safety must be read in light of their intended purpose. Obviously, RCW 46.61.670 was not intended to apply to a roadway without shoulders where the narrow driving portion extends to within inches of a temporary guardrail situated at the road's edge. We conclude that no error was committed in submitting the issue of decedent's contributory negligence to the jury.

Finally, defendant contends that the trial court committed prejudicial error by commenting on the evidence, in violation of article 4, section 16 of the Washington State Constitution. At the close of defendant's recross-examination of an expert witness called by plaintiff to establish the economic loss suffered by decedent's estate, the trial court asked the witness:

> THE COURT: I had one I just wanted to ask the doctor so it is clear to the jury. Doctor, this net figure you testified to, this is the *actual amount* that the family *would* be expected to receive from his income over the years.

(Italics ours.)

■ It was stated in *Jankelson v. Cisel,* 3 Wn. App. 139, 145, 473 P.2d 202 (1970) that:

To fall within the ban of article 4, section 16, the jury must be able to infer from the trial judge's comments that he personally believes or disbelieves evidence relative to a disputed issue. The action of the judge must be such that it will fairly import to the jury an expression of judicial opinion relative to credibility of some significant evidence. *State v. Louie,* 68 Wn.2d 304, 413 P.2d 7 (1966).

The trial court's question was only intended to clarify for the jury part of the expert's testimony. It did not import any impression to the jury concerning the trial court's belief of defendant's liability or of the expert witness' credibility.

The other assignments of error raised pertaining to the instructions are technical, rather than substantive.

Judgment affirmed.

PETRIE, C.J., and ARMSTRONG, J., concur.

Petition for rehearing denied June 26, 1972.

Review denied by Supreme Court August 21, 1972.