[Nos. 768-2; 769-2. Division Two. April 5, 1973.]

RONALD J. TOKARZ *et al., Respondents,* v. FORD MOTOR COMPANY, *Appellant.*

JEROME L. LARSON *et al., Respondents,* v. FORD MOTOR COMPANY, *Appellant,* RONALD TOKARZ *et al., Respondents.*

*H. Roland Hofstedt* (of *Merrick, Hofstedt & Lindsey*), for appellant.

*R. L. Gemson* and *W. R. McKelvy* (of *Skeel, McKelvy, Henke, Evenson & Betts*) and *R. Scott Fallon* and *Don Isham* (of *Sullivan & Jones*), for respondents.

PEARSON, C.J.—Two actions for personal injuries and damages were commenced as a result of a 3-car collision on Interstate Highway 5, approximately five miles south of Kalama, Washington. In the first action, Ronald and Susan Tokarz sought recovery against Ford Motor Company on a products liability theory for severe injuries Mrs. Tokarz received as the aftermath of losing control of the Tokarz 1968 Ford station wagon. Occupants of another vehicle, Jerome and Nancy Larson and children, also brought a damage action against Ford Motor Company, Ronald and Susan Tokarz, and against Robert and Ruthann Murphy, who occupied the third involved vehicle. The Murphys cross-claimed for their injuries and damages against Ford and Tokarz.

The two actions were consolidated for trial, which the court limited to three issues: (1) the liability, if any, of

Ford, the manufacturer; (2) the negligence of Susan Tokarz, if any; and (3) the damages sustained by the Tokarzes.

The jury determined the liability of Ford and fixed the Tokarzes' damages at $249,000. The effect of the verdict was to exonerate Mrs. Tokarz from fault and impose liability upon Ford for the injuries and damages to occupants of all three vehicles.

The thrust of Ford's appeal is to challenge the sufficiency of the evidence to establish its liability. In particular, Ford challenges the factual basis of expert testimony offered to establish the cause of the accident. This necessitates a detailed review of the evidence.

The accident occurred at approximately 1 p.m. on January 2, 1970. The day was bright, visibility was unlimited, and the pavement was dry. Mrs. Tokarz, a 26-year-old schoolteacher, was alone in her 1968 Ford station wagon, driving south on I-5 in the extreme right-hand (outside) lane. The Ford was just over 1 year old, had 17,000 miles, and had never been serviced except for warranty maintenance. On this stretch of road, I-5 was straight and level, with two lanes going south and two lanes north. Some 150 to 200 feet directly behind Mrs. Tokarz, in the same lane, was a car driven by Jean Davis, whose husband was in the front seat. Each car was traveling about 65 miles per hour (speed limit 70) and the distance between the cars had not changed in the 10 to 15 minutes before the accident.

On the inside lane, Mr. and Mrs. Murphy were slowly overtaking the other two cars. As the Murphys moved past Mrs. Tokarz, the Ford suddenly swerved left towards the Murphy Cadillac, then right until it went onto the shoulder of the highway, and then left again, striking the right rear quarter of the Murphy car. The Cadillac's gas tank exploded, but Mr. Murphy was able to keep his car under control and bring it to a stop on the left shoulder of the highway, next to the median strip.

The Ford, however, spun out of control, passed behind the Cadillac, and eventually went backwards across the

median strip onto the inside northbound lane. The Larson family, to their great misfortune, was traveling in that lane. The driver violently applied his brakes, but his Plymouth "broadsided" the Tokarz Ford, the front of the Plymouth impacting the left side of the Ford, just in front of the driver. Both cars erupted into flames, and the Ford was completely consumed.

Mr. Davis and a passing truck driver extricated Mrs. Tokarz from her station wagon. She was severely and permanently injured. Although Mrs. Tokarz was not unconscious long, if at all, she remembers nothing from the time she left home that day until recollecting the hospital room in which she lay several days later.[1]

Mrs. Jean Davis, the driver of the following car, observed most of the accident. Mr. Davis, a minister, was seated in the front passenger seat, but had his eyes diverted to the floorboard because the sun was shining brightly in the upper right corner of the windshield. Mr. and Mrs. Murphy observed the front hood portion of the Ford until it collided with their Cadillac. There were no other eyewitnesses to the causative stages of the accident.

Mrs. Davis testified that she observed nothing unusual about the Ford or its driver during the period she followed it. The driver's head did not bob or jerk immediately before the accident. Neither did she observe sparks or dust emanate from underneath the Ford before the first collision. The Ford, however, "quickly leaped into the side of the Cadillac" and she described the movement as a "sudden jerk." On cross-examination, Mrs. Davis agreed that the movement was similar to a sudden jerk on the steering wheel. The testimony of Mr. and Mrs. Murphy essentially corroborates that of Mrs. Davis. They testified that the Ford swerved toward, away, and then toward their Cadillac. Mr. Murphy stated that the interval between swerves was "very short." Mrs. Murphy summed up the Ford's action: "suddenly it seemed to go out of control."

---

[1]Mrs. Tokarz remained hospitalized for approximately 11 months.

Following the accident, the tow truck operator, Mr. Johnson, discovered that the drive shaft of the Ford was broken and that a piece of the drive shaft was missing. He searched the area of the accident for about an hour, but did not find the missing piece. He also discovered an unusual hole under the driver's seat, directly above the drive shaft in the "hump" of the floorboard. The floor in that area is metal and the hole was produced by a force from outside the car. The ragged edges were also peculiar in that the metal on one side of the hole was doubled over the parent metal, rather than sticking up in the air. The car was eventually taken to an auto wrecking yard owned by Mr. Langley, who had been in the business for more than 20 years. In the course of his usual inspection of every car he received, Mr. Langley also noticed the hole. He remembered it well, he said, because he had never before seen a similar one in that location.

The accident scene was initially investigated by state highway troopers. Two of the officers, each with many years' experience, testified at trial. Neither officer noticed any gouges or scrapes in the concrete southbound lanes within 500 feet of the Ford that they would associate with the accident. The only marks on the road associated with the Ford that they observed were tire marks, the farthest being 234 feet from the Ford's final resting place. This tire mark was on the white center dividing line and indicated that the car was veering to the right, toward the shoulder. A private investigator, formerly with the Seattle police, and with 20 years of accident investigation experience, examined the roadway about two weeks later and testified that he found a significant gouge mark about 110 feet from the Ford's final position, that he definitely attributed to the broken drive shaft. The mark was straight, roughly parallel with the center line of the lane, and 9 to 11 inches long. A representative of the Tokarz insurer was present when this gouge was discovered. The two men testified that this was not the only mark in the pavement, but because of its size and configuration it was the most important.

The broken drive shaft was examined by several engineering experts. Plaintiff's[2] experts testified that the drive shaft broke because of a defective weld, caused by automatic welding equipment at the factory.

Professor Kieling, one of the experts called by plaintiff, testified that 15 percent of the weld was brittle. The brittle portion was located just behind a flywheel-type balance weight attached to the drive line to eliminate noise. This weight was quite massive compared to the rest of the drive shaft. The defective weld, under stress created by bending due to a severe vibration induced by a rough road, caused the drive shaft to suddenly fail. He was clear and specific that the failure was sudden and not a "fatigue"-type failure. Professor Kieling and one of the police officers, each of whom had personal knowledge, testified that the outside, southbound lane of I-5 was "rough." Professor Kieling concluded that the drive shaft failed before any collision occurred and was the cause of the Ford's jerky loss of control. In his opinion, this conclusion was compelled because (1) the Cadillac-Ford collision was not severe enough to fracture a properly welded drive line; and (2) the Plymouth-Ford impact, while it could explain a broken drive shaft, could not explain the hole under the seat. In his opinion, the hole "had the imprint of the balance weight." The balance weight would only have the kinetic energy sufficient to rupture the floorboard if it were rotating at highway speeds.

Another of plaintiff's experts, Mr. C. V. Smith, while not disagreeing with Professor Kieling, offered another explanation. He agreed that the weld was brittle and the drive line failure was the cause of the loss of control. In his opinion, however, there was a defect in the missing piece. Under the influence of the rough road, this piece of the drive shaft bent, actually became deformed, and caused the defective weld to separate. The bent portion of the drive shaft, rotating at 3,500 revolutions per minute and flopping

---

[2]Plaintiff will be used to designate Mr. and Mrs. Tokarz.

about under the car, could account for the peculiar configuration of the hole in the floorboard.

Both Professor Kieling and Mr. Smith agreed that the missing piece of the fractured drive shaft was thrown clear of the car, as the shaft revolved at high speed. Both experts testified that a broken drive shaft would explain the erratic, jerky movement of the Ford before the first collision in any or all of three ways. First, the sudden severance of the drive shaft, which would disconnect the engine (the source of power) from the wheels, coupled with the tearing of the hole in the floor, could startle the driver sufficiently to cause loss of control. Second, the broken drive shaft would flop about and swing right to left under the car, bending and binding as it came into contact with the car body and the pavement; such action would tend to stop its rotation, with a result similar to intermittent application of the hand brake. Finally, the broken shaft could gouge into the pavement and actually catapult the car into an erratic movement.

Defendant's experts completely disagreed. In their opinion, the weld was neither brittle nor defective in any way. Microphotographs taken by a metallurgist were introduced to support their contention. From their examination, the fractures to the drive line were completely consistent with the severe impacts between the three vehicles. They also disagreed that the hole was caused either by the balance weight or a bent drive shaft. They testified that neither the balance weight nor the edges of the hole exhibited the abrasion or scratch markings necessary to explain a rotating injury to the floorboard. Moreover, one of Ford's experts opined that the hole exhibited the characteristics of a puncture and theorized that the missing piece of the drive shaft, broken during the impact, may have been caught between the car and the pavement and pierced the metal. The other defense expert, who did not fully subscribe to this impaling theory, testified that the hole had the characteristics of a single, sudden impact, and definitely was not from the rapidly rotating shaft or balance weight.

The defendant's experts placed great emphasis on their failure to find any evidence of the shaft's beating on the underside of the car, the absence of gouge marks in the highway reported by the police, and the testimony of Mrs. Davis that she saw no sparks or dust emanate from under the car prior to the first collision. In their opinion, these facts completely excluded the conclusions of plaintiff's experts. A Ford engineer testified that had the drive shaft broken at 65 miles per hour, the underside of the Ford would have looked "like the Fourth of July" from the sparks of metal on metal and metal on concrete. In his opinion, a following driver in Mrs. Davis' position could not help observing what would amount to a pyrotechnic display.

All the experts agreed that the failure of the drive shaft at the so-called brittle weld was not a fatigue failure, but instead was a sudden failure. While there was some disagreement, all the experts substantially agreed that this fracture was the result of a bending of the drive shaft. Plaintiff's experts found some, albeit very slight, indications of rotational forces at work on the fracture, while defendant's experts found none at all. Thus, the critical factual question presented to the jury was "what caused the bending." Was the car's bouncing up and down on the rough roadway sufficient to induce so severe a vibration in the drive shaft that it bent and caused a defective weld to fracture, as Professor Kieling thought? Was the missing piece so defective that it bent and became deformed, due to the rough road, as Mr. Smith concluded? Or was the weld defective at all, and the best explanation of the trauma to the shaft and floorboard to be found in the violent collisions suffered by the Ford, as defendant's experts propounded? Clearly, the jury found the drive shaft to be defective and the cause of the Ford's loss of control.

Three of Ford's assignments of error are directed to the admission of opinion evidence of three experts called by plaintiff to establish the ultimate fact in issue, namely, the cause of the accident. It is contended generally that the

opinions were not supported by sufficient facts and consequently were conjectural. Were those opinions excluded, Ford contends, there was insufficient evidence to support a jury verdict against it, and the causes of action should have been dismissed.

At the outset, we note that the purpose of permitting expert opinion testimony is to assist the trier of fact in understanding matters not within the common experience of mankind. *Weber v. Biddle*, 4 Wn. App. 519, 483 P.2d 155 (1971). It is well established that the qualification of an expert is within the discretion of the trial court, and, absent abuse, will not be disturbed on appeal. *In re Estate of Hastings*, 4 Wn. App. 649, 484 P.2d 442 (1971). Once basic qualifications are shown, deficiencies in the qualifications go to weight, rather than admissibility. *Palmer v. Massey-Ferguson, Inc.*, 3 Wn. App. 508, 476 P.2d 713 (1970). Similarly, the thoroughness of an expert's examination of the real evidence is a matter of weight for the jury. *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 452 P.2d 729 (1969).

The limitations on expert opinion testimony are also well settled. The opinion must be founded on facts in evidence, whether disputed or undisputed, and all material facts necessary to the formulation of a sound opinion must be considered. *Vaupell Indus. Plastics, Inc. v. Department of Labor & Indus.*, 4 Wn. App. 430, 481 P.2d 577 (1971). If the expert's opinion assumes the existence of conditions or circumstances not of record, its validity dissolves and the answer must be stricken. *Hansel v. Ford Motor Co.*, 3 Wn. App. 151, 473 P.2d 219 (1970). So long as the answer is fairly based on material facts, supported by substantial evidence under the examiner's theory of the case, however, the opinion testimony is proper. The trial court has wide discretion to determine whether expert testimony falls within the above rules. *Myers v. Harter*, 76 Wn.2d 772, 459 P.2d 25 (1969); *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 381 P.2d 605 (1963).

An expert may testify in terms of inference if, under the circumstances, resort to inferences is necessary

to convey to the jury the full import of the factual testimony. The guiding principle is whether resort to inferences is necessary to assist the jury in understanding matters outside the common ken. *Palmer v. Massey-Ferguson, Inc., supra.* Moreover, the expert may express an opinion on the ultimate fact to be determined by the jury, so long as the inference drawn is not misleading or a matter of common knowledge. *Parris v. Johnson,* 3 Wn. App. 853, 479 P.2d 91 (1970).

We do not see Ford's attack on the admission of the opinions as an attack on the qualifications of plaintiff's experts, nor does Ford contend that the subject matter of the evidence is within the general knowledge of laymen. Rather, Ford invites us to clarify the limits and boundaries of what is essential to support an expert opinion on an ultimate fact, with the view of determining as a matter of law the insufficiency of the foundational facts.

We have thoroughly reviewed the record in light of the authorities and find no clarification necessary. This case falls squarely within the ambit of established precedent. Quite clearly, if the plaintiff's expert testimony is conjectural and the jury rendered its verdict on the basis of such speculation, the judgment on the verdict must fall. In *Lamphiear v. Skagit Corp.,* 6 Wn. App. 350, 356, 493 P.2d 1018 (1972), however, we said,

> A verdict does not rest on speculation or conjecture when founded on reasonable inferences drawn from circumstantial facts. . . . As we stated in *Martin v. Insurance Co. of North America,* 1 Wn. App. 218, 221, 460 P.2d 682 (1969): "An inference is a logical conclusion or deduction from an established fact."

In *Lamphiear,* plaintiff's experts propounded two inconsistent factual theories to support products liability and defendant asserted a third contradictory theory to support its defense of negligent use. We said at page 357:

> While it is obvious plaintiffs' theories are inconsistent with each other to the extent that if one theory was correct the other could not be correct, they are not inconsistent with the main fact to be established. It is only

necessary that the circumstances proved be consistent with each other and lead with reasonable certainty to the fact asserted.

In this case, the material undisputed circumstantial facts are (1) the Ford's loss of control was sudden and erratic; (2) the drive shaft was broken; (3) the break in the drive shaft was due to bending with little or no torsional stress evident; (4) a substantial piece of the drive shaft was missing and unaccounted for after a diligent search was conducted; (5) there was a peculiarly configured hole in the floorboard directly above the drive shaft; (6) the driver of a following car within 200 feet of the Ford at the time of loss of control did not see sparks emanating from under the car; (7) at the time of the accident, the Ford had 17,000 miles and had never been serviced except for warranty maintenance; and (8) the pavement was dry and the sun was bright and glaring in the face of southbound drivers.

In addition, there was substantial evidence from which the jury could find on disputed testimony (1) that there were several marks on the highway in the path that the Ford traveled, one of which was quite peculiar in length and configuration; (2) that the pavement was rough in the outside southbound lane; and (3) that the weld on the drive shaft was brittle and left the manufacturer's control in that defective condition. We must view these facts favorably to plaintiff.

From these facts, we think plaintiff's experts were well within bounds when they gave their opinions concerning the sequence of events that established the cause of the accident as a defective drive shaft. Their "theories" were legitimate inferences deduced from the material physical facts in evidence.

Ford complains specifically that Mr. Smith's testimony of a defect in the missing piece is pure guesswork. We disagree. All the experts agreed that a properly constructed drive shaft would not fracture under the stresses induced by the rough outside southbound lane. The undisputed evidence was that the drive line was broken and a piece was

missing. Moreover, it is virtually undisputed that the break was due to bending. Another undisputed fact is the hole in the floorboard.

Although disputed, the jury was entitled to find a defective weld and gouge marks in the highway, facts which are inconsistent with Ford's theory of the accident. Mr. Smith's deduction that the bending forces necessary to fracture the drive line could have been generated by a defective drive shaft is a legitimate inference. This inference follows directly from the material physical facts in evidence and explains those facts to a jury composed of laymen. Of course, his opinion is simply an inference and the jury was not required to reach his conclusion. But so far as appellate review is concerned, it was an inference based on the material facts in evidence and reached after a consideration of all material facts.

We have thoroughly reviewed the record and conclude that there is substantial evidence to support a set of circumstantial facts from which Ford's liability can be logically and reasonably inferred, which facts are inconsistent with any reasonable theory that the drive shaft broke during the collision. *Lamphiear v. Skagit Corp., supra.* The brittle weld, the gouge marks on the pavement, and the rough roadway, together with the unusual characteristics of the hole in the floor of the car, were circumstances which justified the jury in accepting the conclusions of plaintiff's expert and rejecting conclusions of defendant's expert on the cause of the accident.

We now turn to Ford's remaining contentions. Ford assigns error to the plaintiff's use of its discovery deposition of Professor Kieling. The use of discovery depositions is authorized by CR 26(d)(3), if the witness "resides out of the county and more than 20 miles from the place of trial, unless it appears that the absence of the witness was procured by the party offering the deposition; . . ."[3] At

[3]The trial of this case occurred before the effective date of the new discovery rules. Even under the new rules, however, the use of this deposition would be permissible under the circumstances presented. CR

the time of trial, it is undisputed that Professor Kieling's residence satisfied the requirements of the rule. *See Aircraft Radio Indus., Inc. v. M.V. Palmer, Inc.*, 45 Wn.2d 737, 277 P.2d 737 (1954). Moreover, at the time the discovery deposition was taken, Ford was notified by plaintiff's counsel that it might be used for "other purposes, including perpetuation." The trial court did not err in admitting Professor Kieling's deposition into evidence.

Ford also assigns error for the failure of the trial court to instruct the jury to find in Ford's favor if there is nothing more tangible to proceed upon than two or more conjectural theories under one or more of which Ford would be liable and under one or more of which there would be no liability. What we said in *Raybell v. State*, 6 Wn. App. 795, 804, 496 P.2d 559 (1972) is applicable here. The theories were "substantial and not conjectural . . ." The outcome depended upon which circumstantial evidence the jury chose to believe. Consequently, that rule was not applicable.

Finally, Ford assigns error for the trial court's giving an instruction on circumstantial evidence. That instruction was properly given, since both parties were relying upon circumstantial facts.

Judgment affirmed.

PETRIE and ARMSTRONG, JJ., concur.

---

32(a) (effective July 1, 1972); *see Aircraft Radio Indus., Inc. v. M.V. Palmer, Inc.*, 45 Wn.2d 737, 277 P.2d 737 (1954); P. Trautman, *Discovery in Washington*, 47 Wash. L. Rev. 409, 427 (1972).